# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE MASSEY ENERGY COMPANY DERIVATIVE AND CLASS ACTION LITIGATION | ) ) ) ) ) | Consolidated C.A. No. 5430-CB |

## OPINION

Date Submitted:  February 8, 2017
Date Decided:  May 4, 2017

Stuart Grant, Cynthia A. Calder, and Michael T. Manuel of GRANT & EISENHOFFER P.A., Wilmington, Delaware; Mark Lebovitch and David Wales of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Gregory M. Nespole and Benjamin Y. Kaufman of WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, New York, New York; Nadeem Faruqi of FARUQI & FARUQI, LLP, New York, New York; *Co-Lead Attorneys for Plaintiffs*.

Kevin G. Abrams, Matthew L. Miller, and Michael A. Barlow of ABRAMS & BAYLISS LLP, Wilmington, Delaware; Ronald S. Rolfe and Julie A. North of CRAVATH, SWAINE & MOORE LLP, New York, New York; *Attorneys for Defendants James B. Crawford, Robert H. Foglesong, Richard M. Gabrys, E. Gordon Gee, Bobby R. Inman, Dan R. Moore, Stanley C. Suboleski, and Lady Barbara Thomas Judge*.

Kenneth J. Nachbar and Ryan D. Stottmann of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; William W. Taylor, III and Steven N. Herman of ZUCKERMAN SPAEDER LLP, Washington, DC (on behalf of Don. L. Blankenship); Peter H. White of SCHULTE ROTH & ZABEL LLP, Washington, DC (on behalf of Mark A. Clemens and Jeffrey M. Jarosinski); Stephen E. Baril of KAPLAN VOEKLER CUNNINGHAM & FRANK PLC, Richmond, Virginia; Stephen P. Anthony of COVINGTON & BURLING LLP, Washington, DC (on behalf of Christopher Adkins); *Attorneys for Defendants J. Christopher Adkins, Don L. Blankenship, Mark A. Clemens, Jeffrey M. Jarosinski, and Baxter F. Phillips, Jr.*

Kevin G. Abrams, Matthew L. Miller, and Michael A. Barlow of ABRAMS & BAYLISS LLP, Wilmington, Delaware; Greg A. Danilow and Caroline H. Zalka of WEIL, GOTSCHAL & MANGES LLP, New York, New York; *Attorneys for Defendant Linda J. Welty*.

Donald J. Wolfe, Jr., Matthew E. Fischer, and Jacqueline A. Rogers of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Victor L. Hou of CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York; *Attorneys for Nominal Defendant Alpha Appalachia Holdings, Inc.*

**BOUCHARD, C**

In April 2010, an explosion occurred at Massey Energy Company's Upper Big Branch coal mine in West Virginia, killing 29 miners. It was the worst mining disaster in the United States in 40 years, but it was not the first serious accident at a Massey mine. Within weeks of the explosion, stockholders of Massey filed numerous derivative lawsuits, seeking to recover damages on behalf of the company for fines, judgments and other harm it would suffer because of the alleged failure of Massey directors and officers to make a good faith effort to ensure that Massey complied with mine safety regulations.

A series of government and private investigatory reports concluded that the Upper Big Branch mine tragedy was a direct result of Massey's systematic and willful violations of federal and state safety regulations. The disaster later led to the criminal conviction of several Massey executives, including its former Chairman and Chief Executive Officer, Don Blankenship, who resigned in December 2010.

On January 27, 2011, after a lengthy sale process during which multiple strategic parties were solicited to bid, Massey entered into a merger agreement with Alpha Natural Resources, Inc. If Massey stockholders approved the merger, they would receive a combination of shares of Alpha common stock and cash then estimated to be worth approximately $7 billion in exchange for their shares of Massey stock, and Massey would become a wholly-owned subsidiary of Alpha. The

1

merger consideration represented a 27% premium over Massey's stock price on the day before the Upper Big Branch disaster.

Plaintiffs moved for a preliminary injunction against the proposed merger. Their central grievance was that the Massey board failed to transfer their pending derivative claims into a litigation trust for the exclusive benefit of the Massey stockholders rather than allowing the claims to pass to Alpha as the acquiror of Massey.

On May 31, 2011, then-Vice Chancellor Strine denied the motion for a preliminary injunction. Relevant here, he found based on an extensive record that "there seems little doubt" that plaintiffs' derivative claims would survive a motion to dismiss but that plaintiffs also were likely to lose standing to pursue those claims if the merger was consummated.[1] In particular, then-Vice Chancellor Strine noted that plaintiffs were unlikely to satisfy either of the two narrow exceptions to the continuous ownership rule for maintaining derivative standing that the Supreme Court enunciated over thirty years ago in *Lewis v. Anderson*.[2]

After receiving the approval of Massey's stockholders, the Massey-Alpha merger closed in June 2011. For the next five years, this action was stayed, initially

---

[1] *In re Massey Energy Co.*, 2011 WL 2176479, at *2, *20 (Del. Ch. May 31, 2011).

[2] 477 A.2d 1040 (Del. 1984).

at the request of prosecutors because of ongoing criminal investigations, and later because of Alpha's bankruptcy filing in 2015.

After Alpha emerged from bankruptcy in 2016, the Court was asked to decide motions to dismiss that the defendants had filed. By this point, the operative complaint asserted two claims against fourteen former directors and officers of Massey for breaching their fiduciary duties by "causing Massey to employ a deliberate and systematic business plan of willfully disregarding both internal and external safety regulations."[3]

The allegations underlying both claims are identical. The first claim was styled as a direct claim for "inseparable fraud" based on *dictum* from a 2010 Delaware Supreme Court decision in *Arkansas Teacher Ret. Sys. v. Caiafa*.[4] The second claim was styled as a derivative claim. For the reasons discussed below, I conclude that both claims must be dismissed.

Although Count II contains numerous detailed allegations that would state a viable derivative claim for relief under *Caremark*, it must be dismissed because plaintiffs lost standing to pursue the claim under well-settled Delaware law that stockholders of Delaware corporations who transfer their shares as a result of a merger lose standing to litigate the derivative claims unless one of two narrow

---

[3] Compl. ¶¶ 235, 245.

[4] 996 A.2d 321 (Del. 2010).

exceptions applies. Neither exception applies in this case, however, as then-Vice Chancellor Strine foretold in 2011, and as plaintiffs effectively concede.

The plaintiffs' putative "direct" claim (Count I) also must be dismissed. As explained below, our Supreme Court clarified in 2013 that the theory of "inseparable fraud" does not constitute a third exception to the continuous ownership rule and that, in order to state such a claim, the challenged conduct preceding a merger must itself form the basis of a direct claim. Here, despite plaintiffs' best efforts to transform their case from a derivative action to a class action, application of the *Tooley* test for distinguishing between direct and derivative claims leads to the conclusion that Count I is, in reality, a derivative claim to remedy corporate mismanagement that caused injury to Massey. Count I thus meets the same fate as Count II, and must be dismissed.

Although the net result of this decision is that plaintiffs will not be able to press what otherwise would be a viable derivative claim, that result is equitable in my view. Alpha paid a substantial sum in 2011 to acquire all of the assets of Massey. One of those assets is the derivative claim at issue in this case. It thus is appropriate that Alpha, which assumed considerable liabilities when it acquired Massey in the wake of the UBB disaster, have the right to exercise control over the property it paid to acquire, if for no other reason so that it may mitigate the considerable liabilities it assumed when it acquired Massey.

4

## I. BACKGROUND

The facts in this opinion come from the Verified Stockholder Fourth Amended Class Action and Derivative Complaint filed on October 17, 2014 (the "Complaint") and the May 31, 2011 memorandum opinion denying plaintiffs' motion for a preliminary injunction (the "May 2011 Opinion"),[5] which is referenced in the Complaint. Any additional facts are either undisputed or subject to judicial notice.

### A. The Parties

Nominal Defendant Massey Energy Company ("Massey" or the "Company") was a Delaware corporation that maintained its corporate headquarters in Richmond, Virginia. On June 1, 2011, Alpha Natural Resources, Inc. ("Alpha") acquired Massey in a merger transaction pursuant to which Massey became a wholly-owned subsidiary of Alpha (the "Merger"). Massey is now known as Alpha Appalachia Holdings, Inc.

Before the Merger, Massey was the largest producer of Central Appalachian coal, and the fourth largest producer of bituminous coal in the United States. Massey subsidiary Performance Coal Company owned the Upper Big Branch ("UBB") mine.

Plaintiffs consist of two pension funds and two individuals who allege they were stockholders of Massey at all times relevant to this action. Defendants consist

---

[5] *Massey*, 2011 WL 2176479.

of fourteen individuals who served at various times as directors or officers of Massey before the Merger.

Defendant Don L. Blankenship was a Massey director from 1996 through December 31, 2010, Chief Executive Officer and Chairman of the Board from November 30, 2000 through December 31, 2010, and President from November 2000 until November 2008.

Defendant Christopher Adkins was Senior Vice President and Chief Operating Officer of Massey starting July 2003. Throughout the relevant timeframe, Adkins was responsible for all underground mining operations at Massey, including those at UBB.

Defendant Mark A. Clemens was Massey's Senior Vice President, Group Operations from July 2007 until the Merger.

Defendant Jeffrey M. Jarosinski was Massey's Chief Compliance Officer since December 9, 2002 and Vice President, Finance since November 30, 2000. Jarosinski was also Chief Financial Officer between November 30, 2000 and December 9, 2002.

Defendant Baxter F. Phillips, Jr. was a Massey director from May 2007 and was President from November 2008 until the Merger. Phillips succeeded Blankenship as Chief Executive Officer on January 1, 2011.

6

Defendant Bobby R. Inman served as a Massey director from 1985 until the Merger. Inman was appointed as the Company's lead independent director and assumed the Chairman role when Blankenship left the Company.

Defendants James B. Crawford, Robert H. Foglesong, Richard M. Gabrys, E. Dan R. Moore, Stanley C. Suboleski, and Lady Barbara Thomas Judge, each served as non-management directors of Massey since at least 2008, and were on the board at the time of the UBB disaster and when the board approved the Merger.

Defendant E. Gordon Gee was a member of the board from November 30, 2000 until July 1, 2009, during which period he served as a member of the Safety Committee. Defendant Linda J. Welty was appointed a director of Massey on August 16, 2010.

## B.    Massey's Institutional Hostility Toward Miner Safety

Between November 2000 and December 2010, Don Blankenship ran Massey as the Company's CEO and Chairman of the Board. "Although Massey, like most other public companies, had a majority of independent directors, Blankenship was, by any measure, a high profile and dominant CEO" with an "'autocratic' management style."[6]

---

[6] *Massey*, 2011 WL 2176479, at *5.

7

Blankenship believed that "when it came to a miner's safety, Blankenship knew best,"[7] and had a combative relationship with the Mining Safety and Health Administration ("MSHA"), a division of the United States Department of Labor and the key agency responsible for ensuring mine safety and regulatory compliance. In a 2005 internal memorandum, for example, Blankenship instructed Massey's Deep Mine Superintendents to "ignore" certain safety measures in favor of maximizing coal production:

> If any of you have been asked by your group presidents, your supervisors, engineers or anyone else to do anything other than run coal (i.e.—build overcasts, do construction jobs, or whatever), you need to ignore them and run coal. This memo is necessary only because we seem not to understand that the coal pays the bills.[8]

Although Blankenship later issued a clarification, "at the very least it was rational for Massey managers and employees to perceive that if you wished to stay or get ahead at Massey under Blankenship, then the priority of profits over safety was one not to be questioned."[9]

Massey as a company manifested Blankenship's hostility toward regulatory compliance and safety in numerous ways. Massey had a practice of sounding an alarm to notify mine employees of approaching MSHA inspectors up to forty-five

---

[7] *Id.*

[8] *Id.* at *6; Compl. ¶ 48.

[9] *Massey*, 2011 WL 2176479, at *6.

8

minutes ahead of time so that workers could "spruce things up."[10]  There was a practice of manipulating gas monitor reports by taking multiple monitors into a mine and reporting only the lowest reading.  The Company took steps to minimize the number of reported job-related injuries by encouraging miners not to fill out the required paperwork.  Those who complained of these practices allegedly were terminated.  The MSHA concluded that Massey even maintained two separate sets of production and maintenance books, recording safety violations in the UBB mine in one internal set of books while providing another set to the MSHA during required inspections that concealed those violations.

An electrician at the UBB mine recalled in a *New York Times* interview that "[i]t was all about production.  If you worked for them, you didn't ask questions about whether some step like running a cable around the breaker was a smart idea. You just did it."[11]  A veteran foreman claimed that "I have had guys come to me and cry.  Grown men cried—because they are scared."[12]

Massey's record reflected its cavalier attitude toward worker safety.  In 2006, two miners died in a conveyer belt fire at Massey's Aracoma Coal Co. mine after ventilation controls were removed.  In 2007, a jury awarded a former Massey safety

---

[10] Compl. ¶ 51-52.

[11] Compl. ¶ 49.

[12] Compl. ¶ 49.

inspector $2 million in punitive damages, back pay, and emotional and reputational damages, after Massey fired him in retaliation for reporting to the MSHA unaddressed safety violations at a Massey mine.

In 2008, following a joint MSHA and FBI investigation, "Massey pled guilty to criminal charges including one felony count for willful violation of mandatory safety standards resulting in death, eight counts for willful violation of mandatory safety standards, and one count for making a false statement."[13]  Massey agreed to pay approximately $4.5 million in criminal fines and civil penalties, then the largest financial settlement in the history of the coal industry.  Reports surfaced after the plea that Blankenship was informed about the unsafe conditions that led to the Aracoma fire as few as six days before the tragedy, but did nothing.

Also in 2008, Massey settled a derivative action accusing Blankenship and the rest of the board of disregarding federal and state safety and environmental laws. As part of the settlement, the Massey board formed a new committee, the Safety and Environmental Committee, that was required to give quarterly safety reports to the Board on Massey's compliance with mine safety laws.

In 2009, the MSHA assessed 10,653 citations against Massey, an all-time high.  The number of MSHA citations against Massey for safety violations had increased every year between 2005 and 2009.  Even before the UBB tragedy, Massey

---

[13] *Massey*, 2011 WL 2176479, at *6.

had more coal mine fatalities than any other US coal operator from 2000 through the end of 2007, and the most recorded safety violations out of any United States mining company between 2000 and 2009, despite it being only the sixth largest coal producer in the United States.

In 2009, four Massey mines had injury rates more than twice the national rate. Remarkably, UBB was not among them, despite receiving 515 citations and orders in 2009 totaling $897,325 in penalties, and another 124 citations in 2010 just prior to the disaster. Over 39% of the 2009 citations issued at UBB were for "significant and substantial" violations.[14]

According to a MSHA report on the UBB tragedy, the "MSHA issued more orders under Section 104(d) of the Act ('unwarrantable failure' violations, which indicate higher negligence and gravity than some other types of citations) at UBB than at any other coal mine in the country in fiscal year 2009."[15] Also in 2009, the MSHA issued 48 "withdrawal orders" suspending mining activity at the UBB mine on the basis of "'*repeated* significant and substantial violations that the mine operator either knew, or should have known constituted a hazard,' 'nearly 19 times

---

[14] The MSHA defines "significant and substantial" as infractions where an "inspector has indicated that based upon the particular facts surrounding the violation there exists a reasonable likelihood the hazard contributed to will result in an injury or illness of a reasonably serious nature." Compl. ¶ 66 n.2.

[15] Compl. ¶ 102.

the national rate' for that category of violation."[16]  In March 2010, the UBB mine received 53 MSHA citations, including ten for ventilation problems, two for failure to maintain adequate drill dust control and respirable dust standards, and seven related to the accumulation of combustible materials.

In the months after the inauguration of President Obama in January 2009, when prominent union players with ties to a 1984 union showdown at Massey assumed important positions at the MSHA, Blankenship's attitude towards regulators deteriorated further.  At a 2009 Labor Day function in Washington, D.C., for example, Blankenship told a crowd:  "I also know Washington and state politicians have no idea how to improve miner safety.  The very idea that they care more about coal miner safety than we do is as silly as global warming."[17]

## C.    The UBB Disaster

On April 5, 2010, an explosion at the UBB mine killed 29 miners.  It was the deadliest mining disaster in the United States in 40 years.  The tragedy prompted investigations by the State of West Virginia, the United Mine Workers of America, and the MSHA, which culminated in the McAteer Report in May 2011, the UMWA Report in October 2011, and the MSHA Report in December 2011.

---

[16] *Massey*, 2011 WL 2176479, at *8 (emphasis in original).
[17] *Id.*

12

The McAteer Report, commissioned by former West Virginia Governor Joe Manchin in the days following the blast, attributes the explosion to "the ignition of a small amount of methane gas" that was then "fueled by coal dust that had been allowed to build up for miles through the mine."[18] The report found that this "minor" methane ignition would not have culminated in tragedy had mine operators complied with basic safety requirements:

> Small methane ignitions do not have to turn into major explosions if mine operators adhere to basic safety measures, such as maintaining adequate ventilation systems, removing explosive coal dust from mining operations, spreading required amounts of rock dust and ensuring that water sprays on mining equipment are kept in good repair and function properly. Because these basic safety systems failed at UBB, a minor flare-up of methane led to the nation's worst coal mining disaster in 40 years.[19]

The McAteer Report described in painstaking detail Massey's numerous and blatant failures to properly implement legally mandated safety precautions, and how those failures led directly to the deaths of 29 miners. The Report squarely laid the blame for the tragedy on Massey's management:

> Ultimately, the responsibility for the explosion at the Upper Big Branch mine lies with the management of Massey Energy. The company broke faith with its workers by frequently and knowingly violating the law and blatantly disregarding known safety practices while creating a public perception that its operations exceeded industry safety standards.

---

[18] Compl. ¶ 165.

[19] Compl. ¶ 165.

13

The story of Upper Big Branch is a cautionary tale of hubris. A company that was a towering presence in the Appalachian coalfields operated its mines in a profoundly reckless manner, and 29 coal miners paid with their lives for the corporate risk-taking. The April 5, 2010, explosion was not something that happened out of the blue, an event that could not have been anticipated or prevented. It was, to the contrary, a completely predictable result for a company that ignored basic safety standards and put too much faith in its own mythology.[20]

This conclusion—that Massey knowingly flouted the law and caused the UBB disaster by ignoring safety requirements and actively subverting regulatory enforcement—was shared by both the MSHA and the UMWA Reports.[21]

In the weeks following the explosion, Massey stockholders filed derivative suits in West Virginia and Delaware asserting claims for breach of fiduciary duties against Massey directors and officers for disregarding mine safety regulations and failing to address poor safety conditions. In response, on August 16, 2010, the Massey board created an "Advisory Committee" of two newly appointed independent directors, Linda J. Welty and Robert B. Holland III, who were charged with making recommendations on whether Massey should pursue the derivative claims, and whether Massey should change any "management, operations, practice and/or policies."[22]

---

[20] *Massey*, 2011 WL 2176479, at *9.

[21] *See* Compl. ¶¶ 132-36.

[22] *Massey*, 2011 WL 2176479, at *11.

### D. The Alpha Merger

On April 26, 2010, less than one month after the UBB disaster, Michael Quillen, Alpha's board Chairman approached Blankenship about a potential business combination with Massey. Alpha was America's third largest coal producer and had shown an interest in acquiring Massey in the past. By the time Quillen reached out, Massey's stock price had dropped from $53.05 on the last full day of trading before the UBB disaster, to $43.61. Blankenship responded that he did not support a deal with Alpha due to the depressed value of Massey's stock, but agreed to inform the board of Alpha's interest. As then-Vice Chancellor Strine commented in the May 2011 Opinion, "[o]ne senses from the record that Blankenship had no desire to do a deal with Alpha or anyone else that resulted in him not being CEO of the resulting entity."[23]

On May 3, 2010, the Massey board decided that a business combination with Alpha at that time would not be in stockholders' best interest. Despite the setback, on August 11, Alpha sent Massey a non-binding proposal to buy all of Massey's outstanding stock in an all-stock transaction that valued Massey at $37.19 per share, a 20% premium over Massey's then-market price of $30.99. The Massey board concluded that the offer was inadequate and rejected it later that month.

---

[23] *Id.* at *10.

By the fall of 2010, while Blankenship "was espousing the bullish view that Massey had an extrinsic value of at least $90-100 a share," that "selling right after the Disaster was imprudent," and that he "should lead any consideration of an alternative."[24] During this period, lead independent director Bobby Inman and other outside directors increasingly became of the view that it was time for Blankenship to step down, and that remaining independent may not be the best course.

On September 13, 2010, Alpha made another non-binding all-stock offer to purchase Massey, this time for $41.07 per share, a 26% premium over the then-market price of $32.49. On September 28, the two parties met to discuss the proposed combination. At the meeting, Inman clarified to Alpha that the Massey board was open to strategic alternatives, regardless of Blankenship's statements to the contrary. On September 30, Inman further urged Alpha to continue discussions regarding a potential transaction and emphasized that the decision on whether to pursue a deal was for the board and not Blankenship to make.

On October 12, 2010, the independent directors unanimously resolved to establish a strategic alternatives review committee to consider strategic opportunities and to make recommendations to the board about potential transactions. The committee consisted of independent directors Inman and Richard Gabrys, along with Baxter Phillips, a director and Massey's President. Pointedly, Blankenship was

---

[24] *Id.* at *11.

excluded from the committee but his subordinate (Phillips) was included. The committee retained Perella Weinberg Partners LP as its financial advisor. On October 19, the Wall Street Journal published an article about Massey's openness to considering strategic alternatives.

During this period, Blankenship's support among the directors deteriorated. Not only did Blankenship oppose the board's decision to explore a possible sale of the Company, Blankenship's hostility toward regulation had not dimmed in the face of the intense media and government scrutiny that Massey attracted in the wake of the disaster, and he continued to stir controversy with openly-defiant public statements.

In November 2010, after Blankenship denounced the MSHA at a Massey press conference, the board had Inman convey to Blankenship the independent directors' "unanimous view" that he must "stop his public assaults on [the] MSHA."[25] On the evening of November 20, the Advisory Committee on the UBB-related derivative actions delivered a progress report to the other independent directors, stating that Massey's safety protocols remained suboptimal and that "a change in top leadership was required to build the Company's reputation, regain the

---

[25] *Id.* at *12.

17

confidence of shareholders, regulators and public officials, and be in a position to enhance the Company's safety and compliance performance."[26]

On November 21, at Massey's quarterly board meeting, Blankenship agreed to retire after a confrontation with Inman:

> At the quarterly Board meeting on November 21, Blankenship presented his 5-year strategic stand-alone plan for Massey. Blankenship also expressed his continued dissatisfaction with what he perceived were 'constraints' on his ability to 'run the company as he wanted' and to continue his public fight with the MSHA. Blankenship's long-time supporter, Inman, told Blankenship he should consider retiring if he was not comfortable with the situation. Blankenship acceded, and the Board instructed counsel to draft a severance agreement, which when finalized, ultimately permitted Blankenship to receive roughly $12 million in severance.[27]

Later that evening, Perella Weinberg briefed the strategic alternatives committee on the various strategic options, including Massey's standalone plan. The board issued a press release the next day announcing that it was engaging in a "formal review of strategic alternatives," though "there can be no assurance" that a transaction would result.[28] The committee solicited bids from Alpha, ArcelorMittal, S.A., Arch Coal, Inc., and WuSan International Steel, all of whom were strategic acquirors who had expressed past interest in acquiring Massey. Alpha and Arch ultimately submitted bids.

---

[26] Compl. ¶ 197.

[27] *Massey*, 2011 WL 2176479, at *13.

[28] *Id.*

On December 3, 2010, Massey announced Blankenship's retirement, effective December 31. The board appointed Phillips to replace Blankenship as CEO, and Inman to succeed him as Chairman.

On December 10, Arch and Alpha each submitted initial bids that impliedly valued Massey's stock at $70.89 and $60.51 respectively. On January 3, 2011, Alpha and Arch commenced due diligence.

On January 14, Perella Weinberg informed the board that as of January 12, the competing bids represented purchase prices of $74.70 for Alpha and $74.99 for Arch. Perella Weinberg "determined that the synergies that could be achieved through a combination with Alpha exceeded those that were possible or likely with Arch."[29] Perella Weinberg also advised the board, which was considering whether Massey's standalone prospects were superior to the third-party offers, that both bids "materially exceeded" the $68 "upper reach of what [Massey] could achieve" on its own.[30] The board also considered the fact that Massey rarely reached its own projections and that the UBB disaster had damaged Massey's reputation for competence and integrity. The board ultimately concluded that a sale would deliver more value to stockholders and instructed Perella Weinberg to ask Arch and Alpha to submit their final bids by January 24, 2011.

---

[29] *Id.*

[30] *Id.*

On January 24, Arch submitted a reduced final offer valued at $55.50 per Massey share. "Despite that loss in leverage, the Board was able to negotiate a further increase in Alpha's already higher bid:"

> Thus, Alpha's final bid was 1.025 Alpha shares plus $10.00 in cash for each Massey share. This bid represented $69.33 per share based on Alpha's January 26, 2011 closing stock price, a 25% premium to Massey's closing stock price on the same day of $55.26, a 95% premium to Massey's last closing price before the October 19, 2010 Wall Street Journal article reporting that Massey was exploring strategic transactions, and a 27% premium to Massey's stock price immediately preceding the explosion at the Upper Big Branch mine.[31]

On January 27, 2011, the board unanimously approved the Merger with Alpha, which closed on June 1, 2011.

### E.    Criminal Liability for the UBB Disaster

On December 6, 2011, Alpha entered into a non-prosecution agreement with the Department of Justice relating to its criminal investigation of the UBB disaster. The agreement required Alpha to (1) invest at least $80 million in remedial efforts to improve health and safety at legacy Massey operations; (2) pay $48 million into a trust to fund research and development projects to improve miner health and safety; (3) not contest and to resolve certain MSHA proceedings, including all proceedings related to the regulatory violations and explosion at UBB; (4) pay $46.5 million in restitution to the families of the 29 miners who were killed and two miners who were

---

[31] *Id.* at *14.

injured in the UBB disaster; and (5) fully cooperate with the criminal investigation. Alpha also settled a class action lawsuit against Massey for securities fraud for $265 million.

Since the UBB disaster, multiple Massey employees have pled guilty or been convicted of criminal charges for their roles in the UBB tragedy. On December 3, 2015, a federal jury convicted Blankenship of conspiracy to violate federal mine safety and health standards, but acquitted him of other charges.

### F. Procedural Posture

This suit was filed as a derivative action in April 2010, and consolidated with several other derivative actions on October 21, 2010. After the proposed merger with Alpha was announced, plaintiffs amended their complaint and moved to enjoin the proposed transaction because the Massey board had not negotiated to have the pending derivative claim transferred into a litigation trust for the exclusive benefit of Massey stockholders. The Court denied this motion in the May 2011 Opinion. The Merger closed the next day, on June 1, 2011.

After the Merger, this action was stayed for approximately three years at the request of the United States Attorney for the Southern District of West Virginia, which was conducting the Department of Justice's criminal investigation. The U.S. Attorney's office later agreed that the parties could proceed with motions to dismiss.

21

On October 17, 2014, plaintiffs filed their Verified Stockholder Fourth Amended Class Action and Derivative Complaint. Defendants moved to dismiss.

On August 3, 2015, Alpha filed for bankruptcy and this action was automatically stayed. In July 2016, Alpha's reorganization plan was confirmed by the Bankruptcy Court and became effective, dissolving the automatic stay.

## II.    ANALYSIS

The standards governing a motion to dismiss for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[32]

The Court is not required to accept mere conclusory allegations as true or make inferences unsupported by well-pleaded factual allegations,[33] and it "is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[34]

---

[32] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotations omitted).

[33] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999) ("trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences"), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE).

[34] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

## A.    Plaintiffs' Claims

The Complaint asserts two claims for breach of fiduciary duty against fourteen individual defendants, each of whom served at various times as a director or officer of Massey.  Count I is asserted as a direct claim and Count II is asserted, in the alternative, as a derivative claim.  The allegations underlying both claims are the same.  The Complaint summarizes Count I, the direct claim, as follows:

> 235.   The Individual Defendants consciously breached their fiduciary duties by causing Massey to employ a deliberate and systematic business plan of willfully disregarding both internal and external safety regulations. The Individual Defendants authorized and implemented Massey policies and practices of endorsing patently unsafe work conditions. Massey's abysmal record for citations, fines and the like was the result of these policies.

> 236.   The Individual Defendants also endorsed Blankenship's overt and publicly known hostility toward all regulatory bodies and organizations devoted to safety in Massey's mines prior to the UBB disaster.

> 237.   Several regulatory investigations of Massey's operations have concluded that management's willful disregard for compliance with safety regulations led to the UBB disaster.

> 238.   Even in the wake of the UBB disaster, the Individual Defendants continued to support Blankenship's leadership, including his strong criticism of regulators. They knew that Massey was coming under heavier scrutiny and criticism than ever before for its abysmal safety practices, yet they refused to change Massey leadership or practices at Company mines.

> 239.   The Individual Defendants soon came to realize that their long-followed system of attacking regulators and operating their mines without regard to compliance with safety regulations would not work in the post-UBB atmosphere. Regulators were coming down harder

23

than ever before on Massey's operations while Blankenship was increasing the vitriol in his attack on regulatory bodies and other protecting miners [*sic*]. The Individual Defendants realized that Massey simply could not operate as a stand-alone company anymore, and that an immediate sale of Massey was the Company's only option.

240.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, Massey entered into the merger agreement with Alpha at an inadequate, fire sale price for Massey shares.[35]

The Complaint uses identical language to describe Count II, the derivative claim.[36]

I address plaintiffs' claims below, in reverse order.

## B.    Plaintiffs Lack Standing to Assert the Derivative Claim

Count II of the Complaint clearly would state a viable claim for relief that could be pursued in this action if the Merger had not happened. Although a *Caremark* claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment,"[37] the Complaint alleges in excruciating detail a web of specific facts from which it would be reasonable to infer at the pleading stage that Massey fiduciaries knowingly failed to discharge their duty to ensure that Massey complied with its legal obligations when it came to mine safety.[38]

---

[35] Compl. ¶¶ 235-40 (Count I).

[36] *See* Compl. ¶¶ 245-50. Although there are a few word differences between paragraphs 235-40 (Count I) and paragraphs 245-50 (Count II), they are entirely non-substantive.

[37] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

[38] In expressing this view, it is unnecessary for me to draw any distinctions between the various individual defendants. The viability of the *Caremark* claim undoubtedly may vary

Then-Vice Chancellor Strine reached that conclusion based on an earlier pleading in the May 2011 Opinion, where he noted that "there seems little doubt that a faithful application of the plaintiff-friendly pleading standard would preclude a dismissal of [plaintiffs'] claims at the pleading stage."[39]

Count II nevertheless must be dismissed because plaintiffs lost standing to pursue the claim by virtue of the Merger. Since our Supreme Court's decision in *Lewis v. Anderson*, it has been a matter of well-settled Delaware law for over three decades that stockholders of Delaware corporations must hold shares not only at the time of the alleged wrong, but continuously thereafter throughout the litigation in order to have standing to maintain derivative claims, and will lose standing when their status as stockholders of the company is terminated as a result of a merger, except in one of two specific circumstances:

> (i) if the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of the standing to bring a derivative action; or (ii) if the merger is in reality merely a

---

depending on individual circumstances. For example, the claim would appear to be tenuous as to director Welty, who joined the Massey board in August 2010 after the UBB disaster and was appointed to the board's Advisory Committee to investigate and make recommendations concerning the derivative claims. It is not necessary for me to parse the record individual by individual, however, given that Count II will be dismissed in its entirety.

[39] *Massey*, 2011 WL 2176479, at *20; *see also id.* at *21 ("But for purposes of this motion, candor requires acknowledging that the plaintiffs likely have pled Derivative Claims that would survive a motion to dismiss, even under the heightened pleading standard applicable under Rule 23.1.").

reorganization which does not affect plaintiff's ownership in the business enterprise.[40]

The continuous ownership rule has been repeatedly reaffirmed by our Supreme Court, including as recently as a few months ago.[41] The rationale for the rule is that "a derivative claim is a property right owned by the nominal corporate defendant" that then "flows to the acquiring corporation by operation of a merger."[42]

Here, the Complaint does not plead facts from which it would be reasonable to infer that either of the exceptions to the continuous ownership rule applies. Indeed, plaintiffs did not argue in their opposition brief that either exception applies (thus waiving the claim)[43] and, to their credit, plaintiffs expressly acknowledged they were *not* contending that the derivative claim survived the Merger.[44]

Plaintiffs' concession is hardly surprising. The Merger plainly was not a mere reorganization, and then-Vice Chancellor Strine expressly held, based on an

---

[40] *Lewis v. Ward*, 852 A.2d 896, 902 (Del. 2004) (clarifying the exceptions originally identified in *Lewis v. Anderson*).

[41] *See El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016); *see also Kahn v. Kolberg Kravis Roberts & Co.*, L.P., 23 A.3d 831, 836 (Del. 2011) ("Under Delaware law, standing to maintain a derivative suit requires stockholder ownership of the shares throughout the pendency of the case."); *Lambrecht v. O'Neal*, 3 A.3d 277, 284 (Del. 2010) (describing continuous ownership rule).

[42] *Feldman v. Cutaia*, 956 A.2d 644, 654 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008).

[43] *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[44] Tr. 44 (Feb. 8, 2017) ("I am not arguing that the derivative claim survives the merger").

26

extensive preliminary injunction record, that "the record in this case does not support the notion that the Massey Board's pre-Merger conduct necessitated the Merger with Alpha," and actually supported the opposite inference:

> Indeed, the record supports the inference that the Massey Board considered its stand-alone plan as being a viable option, but on the basis of the company's tarnished reputation and history of missing management projections, determined that pursuing the profitable stand-alone plan was not the best choice available.[45]

For these reasons, Count II will be dismissed with prejudice as to the plaintiffs in this action. For the avoidance of any doubt, the dismissal is without prejudice to the ability of Alpha, to which the derivative claim transferred as a property right by virtue of the Merger, to pursue the claim itself.

### C.  Plaintiffs Fails to State a Direct Claim for Inseparable Fraud

Plaintiffs contend that Count I asserts a direct claim of "inseparable fraud" that our Supreme Court endorsed in *Arkansas Teacher Retirement System v. Caiafa* ("*Countrywide I*") in 2010,[46] and clarified three years later in *Arkansas Teacher Retirement System v. Countrywide Financial Corp.* ("*Countrywide II*").[47]  In response, defendants advance two primary arguments in favor of dismissal of Count I:  (1) that the Massey stockholders' approval of the Merger compels dismissal of

---

[45] *Massey*, 2011 WL 2176479, at *30 n.199.

[46] 996 A.2d 321 (Del. 2010).

[47] 75 A.3d 888. (Del. 2013).

27

the claim under *Corwin v. KKR Financial Holdings* and its progeny,[48] and (2) that the Complaint fails to state a direct claim for inseparable fraud.[49]

For the reasons explained below, the second argument is dispositive in my opinion. To put the issue in context, I begin by reviewing the theory of "inseparable fraud" as articulated in the *Countrywide* decisions.

### 1. Delaware Law on "Inseparable Fraud"

In *Countrywide I*, plaintiff Arkansas Teacher Retirement Systems ("TRS"), a former stockholder of Countrywide Financial Corp., appealed the Court of Chancery's approval of a settlement of stockholder litigation relating to Countrywide's merger with Bank of America Corp. Previously, TRS and several other stockholders had asserted derivative claims against Countrywide's directors in federal court in California arising out of the demise of Countrywide before its merger with Bank of America. Those derivative claims were described to the Court of Chancery as—

> —breaches of fiduciary duty by certain Countrywide board members by, their, among other things, (i) abandoning prudent lending practices by focusing the business more heavily on risky (and potentially more lucrative) loans such as pay-option adjustable rate mortgages and home equity lines of credit; (ii) engaging in illegal insider sales by enacting a stock repurchase program at the same time that the individual directors

---

[48] 125 A.3d 304 (Del. 2015).

[49] Various defendants make other arguments for dismissal of the claims asserted against them. It is not necessary to address those arguments to resolve the pending motions.

28

were selling their own shares; and (iii) manipulating the corporate machinery for their own benefit.[50]

The district court dismissed these claims because the stockholder plaintiffs failed to satisfy the continuous ownership requirement to maintain standing to assert derivative claims on behalf of Countrywide as a result of the Countrywide/Bank of America merger.[51]

Later, when Countrywide and Bank of America sought the Court of Chancery's approval of a settlement of litigation relating to their merger, the stockholder plaintiffs from the California federal action objected to the settlement. They argued that the value of their derivative claims, which had been dismissed by this time, "should have been preserved by carving the asset out of the merger transaction and establishing a litigation trust for the benefit of the Countrywide shareholders."[52] The Vice Chancellor overruled the objection, concluding that "surrendering functionally worthless claims in the context of the settlement would be fair, reasonable, and, applying the Court's own business judgment, acceptable."[53]

On appeal, the Supreme Court held that the Vice Chancellor did not abuse his discretion in finding that TRS's derivative claims were worthless and affirmed his

---

[50] *In re Countrywide Corp. Shareholders Litig.*, 2009 WL 846019, at *8 (Del. Ch. Mar. 31, 2009).

[51] *Id.* at *4.

[52] *Id.* at *4, 8.

[53] *Id.* at *9.

approval of the settlement.  After noting, however, that the facts TRS had alleged "reflect conduct wholly inappropriate for Delaware corporate directors," the Supreme Court went on to comment in *dictum* that "Delaware law recognizes a single, inseparable fraud when directors cover massive wrongdoing with an otherwise permissible merger."[54]  In explaining the nature of such a claim, the Supreme Court emphasized (1) the fraudulent character of the alleged pre-merger misconduct and (2) how that misconduct "necessitated" the merger:

> Although we agree that the Countrywide directors and stockholders ran from the *crest* of a ruinous wave of losses, we cannot ignore the close connection between that wave's crest and its underlying trough.   No one disputes that Countrywide needed to sell itself, and at a price significantly below its recent share price.  An otherwise pristine merger cannot absolve fiduciaries from accountability for ***fraudulent conduct*** that ***necessitated the merger***.   TRS has pleaded facts supporting a colorable claim of ***fraud*** that, if proved would have made the company's dissolution or auction a *fait accompli*.

* * * * *

> If the Vice Chancellor had found that TRS had successfully pleaded its *fraud* claim, then TRS—rather than Countrywide—could recover from the former Countrywide directors.   In that case, the injured parties would be the shareholders who would have post-merger standing to recover damages instead of the corporation.  We, therefore, must hold that the Vice Chancellor did not abuse his discretion in approving the settlement, despite facts in the complaint suggesting that the Countrywide directors' premerger agreement *fraud* severely depressed the company's value at the time of BOA's acquisition, and ***arguably necessitated a fire sale merger***. [55]

---

[54] *Countrywide I*, 996 A.2d at 322-23.

[55] *Id.* at 323-24 (emphasis added).

In support of the proposition that Delaware law recognizes a claim for "inseparable fraud," the Supreme Court in *Countrywide I* cited a single case—the Court of Chancery's 1964 decision in *Braasch v. Goldschmidt*.[56] In that case, it was alleged that a controlling stockholder had "coerced the public stockholders into selling their shares pursuant to the offer to buy upon false, deceptive, and misleading statements made in the public press and in official documents," and then completed a short-form merger as "part of a conspiracy to loot" the company "of its assets and properties at the expense of the minority stockholders."[57] In other words, as the Court of Chancery further explained, the complaint charged "in effect if not expressly, that the merger was the final step of a conspiracy to accomplish an unlawful end by unlawful means" to benefit the controller to the detriment of the minority stockholders.[58]

After *Countrywide I* was decided, the stockholder plaintiffs in the California action moved for reconsideration of the dismissal of their derivative claims based on the Delaware Supreme Court's decision. The district court denied the motion. The plaintiffs then appealed to the United States Court of Appeals for the Ninth Circuit, where the parties vigorously disputed the meaning of *Countrywide I*. Plaintiffs

---

[56] 199 A.2d 760 (Del. Ch. 1964).

[57] *Id.* at 763, 767 (internal quotations omitted).

[58] *Id.* at 764.

argued that the inseparable fraud theory constitutes a third exception to the continuous ownership rule while defendants argued that *Countrywide I* did not change the law:

> The plaintiffs argue that, because they allege "a single, inseparable fraud" by which the Countrywide "directors cover[ed] massive wrongdoing with an otherwise permissible merger," they maintain post-merger derivative standing under the fraud exception to the continuous ownership rule, as interpreted by [*Countrywide I*].
>
> The defendant asserts that [*Countrywide I*] merely reaffirmed the traditional scope of the fraud exception, as articulated in *Lewis v. Anderson*, and its progeny. The defendants argue that the fraud exception to the continuous ownership requirement applies only where the plaintiffs allege that the merger was executed "merely" to destroy derivative standing and lacked any legitimate business purpose.[59]

Against this backdrop, the Court of Appeals certified the following question to the Delaware Supreme Court:

> Whether, under the "fraud exception" to Delaware's continuous ownership rule, shareholder plaintiffs may maintain a derivative suit after a merger that divests them of their ownership interest in the corporation on whose behalf they sue by alleging that the merger at issue was necessitated by, and is inseparable from, the alleged fraud that is the subject of their derivative claims.[60]

In *Countrywide II*, the Delaware Supreme Court answered that question "in the negative" and reaffirmed the continuous ownership rule and the two exceptions

---

[59] *Countrywide II*, 75 A.3d at 891 (internal citations omitted).

[60] *Id.* at 890.

recognized in *Lewis v. Anderson*.[61]   In doing so, the Supreme Court held

unequivocally that its "*dictum* about 'inseparable fraud'" in *Countrywide I* "referred

to **direct, not derivative** claims,"[62] and explained how this conclusion was supported

by the *Braasch* decision, as follows:

> *Braasch v. Goldschmidt* was cited in both *Lewis v. Anderson* and
> [*Countrywide I*].  It supports the conclusion that where pre-merger
> fraudulent conduct makes a merger inevitable, that conduct gives rise
> to a direct claim that can survive the merger, but not a derivative claim.
> In [*Countrywide I*], this Court was careful to cite that portion of
> *Braasch* which discusses the survival of *direct* claims, when addressing
> the direct claims that the plaintiffs here could have brought (but did
> not), and separately to that portion of *Braasch* that discusses loss of
> derivative standing when addressing the plaintiffs' derivative claims.

Thus, Countrywide *II* holds that a claim for inseparable fraud does not

constitute a third exception to the continuous ownership rule for derivative standing,

but that such a claim must itself be a direct claim.  The Court further explained that

its "'inseparable fraud' *dictum* is consistent with the framework for distinguishing

between direct and derivative claims adopted in *Tooley v. Donaldson, Lufkin &*

*Jenrette*:"[63]

> In *Tooley*, this Court held that whether a claim is direct or derivative
> turns "solely on the following questions: who suffered the alleged
> harm—the corporation or the suing stockholder individually—and who
> would receive the benefit of the recovery or other remedy?"  In
> [*Countrywide I*], this Court stated that any injury flowing from the

---

[61] *Id.*

[62] *Id.* at 896 (emphasis added).

[63] *Id.*

33

"inseparable fraud" would be suffered by the shareholders rather than the corporation and any recovery would go to the shareholders rather than the corporation: "If the Vice Chancellor had found that the plaintiffs had successfully pleaded their fraud claim then plaintiffs— rather than Countrywide—could recover from the former Countrywide directors. In that case, the *injured parties would be the shareholders* who would have post-merger standing to recover damages instead of the corporation." Accordingly, this Court's unambiguous language in [*Countrywide I*] demonstrates that any "inseparable fraud" claim would be direct.[64]

In sum, as I read the *Countrywide* decisions, in order to state a claim of inseparable fraud, a plaintiff must plead facts from which it would be reasonably conceivable that (1) a defendant engaged in serious misconduct before a merger that constitutes a direct claim[65] and (2) the merger must have been "necessitated" or made "inevitable" by that misconduct. The first issue turns on the application of the *Tooley* test. The second issue is one of causation.

Thus, the threshold question here is whether the pre-Merger conduct challenged in the Complaint forms the basis of a direct or derivative claim. I turn to that next.

---

[64] *Id.* at 896-97 (alterations in original omitted).

[65] As explained above, the Supreme Court in *Countrywide I* repeatedly emphasized the "fraudulent" nature of the conduct at issue in that case when articulating the "inseparable fraud" theory. It is not clear to me whether it intended to limit the application of the theory to a claim that literally would satisfy the elements of a fraud claim, or intended that it would apply to any form of serious misconduct—such as an egregious breach of fiduciary duty— that necessitates a merger. It is not necessary for me to decide that issue here because, either way, plaintiffs' allegations concerning the defendants' pre-merger conduct fail to support a direct claim for relief.

## 2.     Defendants' Claim Challenging the Defendants' Pre-Merger Conduct is Derivative

In *Tooley*, the Delaware Supreme Court held that whether a stockholder's claim is derivative or direct "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)."[66] Elaborating on its holding that "a court should look to the nature of the wrong and to whom the relief should go," the Supreme Court further explained that the stockholder's "claimed direct injury must be independent of any alleged injury to the corporation," and that the stockholder "must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[67]

Although Count I is pled as a direct claim, a "claim is not 'direct' simply because it is pled that way, and mentioning a merger does not talismanically create direct action. Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claim exists."[68]

---

[66] 845 A.2d at 1033.

[67] *Id.* at 1039.

[68] *Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004).

Here, the gravamen of plaintiffs' allegations is that the defendants breached their fiduciary duties by employing "a deliberate and systematic business plan of willfully disregarding both internal and external safety regulations" for several years before the Merger[69] According to the Complaint, defendants' misconduct exposed Massey to legal liability for fines, restitution and remedial work,[70] ruined its relationship with regulators,[71] damaged its reputation,[72] depressed its stock price,[73] impaired its ability to operate as a standalone entity,[74] and ultimately caused Massey to enter the Merger at an inadequate price.[75]

On its face, engaging in a "business plan" to disregard safety regulations is a form of mismanagement, whether or not it is styled as a *Caremark* claim for failing to exercise proper oversight and supervision. The duty implicated "is plainly the

---

[69] Compl. ¶ 235.

[70] *See* Compl. ¶ 207 (alleging that, after the Merger, Alpha entered a non-prosecution agreement requiring it to invest at least $80 million in "remedial safety measures," to pay $48 million "into a trust to fund research and development projects to improve miner health and safety," and to pay $46.5 million in restitution "to the families of the 29 miners killed and the two miners injured by the explosion at the UBB"); *see also* Compl. ¶ 18 (alleging that Alpha was required to "pay and invest more than $200 million for remedial efforts, safety research, fines and restitution").

[71] Compl. ¶¶ 11, 239.

[72] Compl. ¶ 1.

[73] Compl. ¶ 205.

[74] Compl. ¶ 239.

[75] Compl. ¶ 240.

36

directors' normal duty to manage the affairs of the corporation," which "is owed to the corporation and not separately or independently to the stockholders."[76] That the mismanagement is alleged to have involved unlawful activity makes no difference.[77]

The allegations of harm identified in the Complaint, furthermore, are prototypical examples of corporate harm that can be pursued only derivatively. The prospect of Massey paying fines, penalties, restitution, legal settlements, and the like as a result of defendants' systematic disregard of safety regulations that would come out of its corporate treasury constitute harm to the Company by definition and not to any individual stockholder. On the flip side, the benefit of any recovery for such harm naturally would be owed to the Company as reimbursement and not to any individual stockholder. The depressive effect that such mismanagement may have caused to the Company's stock price also would be derivative of the harm caused to the corporation. As our Supreme Court explained in *Kramer v. Western Pacific Industries, Inc.*, a case cited with approval in *Tooley*: "Delaware courts have long recognized that actions charging mismanagement which depress the value of stock

---

[76] *Dieterich*, 857 A.2d at 1027.

[77] *In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 998 (Del. Ch. 2004) (finding that company chairman's violations of the Foreign Corrupt Practices Act, which resulted in a $2 million fine and downward renegotiation of a potential merger price, gave rise to derivative claims because "[t]he change in the terms of the then-pending merger agreement simply reflected a change in the market value of [the company] resulting from the public disclosure of [the director's] alleged misconduct").

allege a wrong to the corporation; *i.e.*, the stockholders collectively to be enforced by a derivative action."[78]

None of this is news to the plaintiffs. Indeed, this is precisely how they viewed essentially the same constellation of allegations found in their current Complaint when they sought a preliminary injunction against the Merger six years ago, asserting that their "pending 'Derivative Claims' should be transferred into a litigation trust for the exclusive benefit of Massey stockholders."[79]

Recognizing the strictures that the continuous ownership rule imposes on a former stockholder's standing to assert derivative claims after the closing of a merger, it is understandable that plaintiffs' counsel, as zealous and highly experienced advocates, would try to repackage their allegations into a direct claim under the theory of inseparable fraud. But the attempt misses the mark because, at bottom, the thesis of the Complaint does not involve conduct—fraudulent or otherwise—that caused injury to any stockholder individually or separately from

---

[78] *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) (alterations and internal quotations omitted); *see also Feldman v. Cutaia*, 951 A.2d 727, 734-35 (Del. 2008) ("In *Kramer*, our analysis recognized that claims of mismanagement resulting in a decrease in the value of corporate stock are derivative in nature, while 'attacks involving fair dealing or fair price' in a corporate transaction are direct in nature."); *Agostino v. Hicks*, 845 A.2d 1110, 1123 (Del. Ch. 2004) (internal quotations omitted) ("In my opinion, the nature of this claim is nothing more than a claim of mismanagement that . . . is entirely derivative in nature")

[79] 2011 WL 2176479, at *2.

causing harm to the corporation. The point is perhaps best illustrated by comparing the allegations underlying the claims asserted in *Braasch* and *Countrywide* to this case.

In *Braasch*, a controlling stockholder was alleged to have defrauded the minority stockholders into selling their shares based on false and misleading statements made in a tender offer that was followed by a pre-planned short-form merger. Clearly, the minority stockholders—not the corporation—suffered the harm from the alleged scheme to acquire their shares on the cheap. Stated differently, the minority stockholders articulated a theory on which they could prevail against the controller without showing an injury to the corporation.

In *Countrywide*, certain insiders allegedly inflated Countrywide's stock price by causing the company to engage in unsustainable short-term business practices while conducting a stock repurchase program, during which time the defendants sold $848 million worth of their own stock, knowing that their actions ultimately would destroy the company.[80] Countrywide's market capitalization fell precipitously during this period, from approximately $26 billion in 2007 to just $4.1 billion in 2008. As in *Braasch*, insiders again were alleged to have profited through fraudulent behavior at the expense of other stockholders.

---

[80] *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1055 (C.D. Cal. 2008).

Here, in contrast to *Braasch* and *Countrywide*, the Complaint is devoid of any allegations that any of the defendants—including Blankenship, the protagonist behind Massey's abysmal safety record—engaged in misconduct ***to secure personal benefits for themselves to the detriment of any Massey stockholder separately or individually***. The Complaint does not allege, for instance, that any of the defendants sold stock at inflated values or engaged in any other form of self-enrichment through the pursuit of the alleged "business plan of willfully disregarding both internal and external safety regulations."[81]

Indeed, the Complaint does not even allege that the Company's disregard of safety was concealed, the hallmark of a fraud. The Complaint proceeds from the opposite premise: that Massey had an "openly hostile relationship with its regulators" and that the individual defendants endorsed Blankenship's "overt and publicly known hostility toward all regulatory bodies and organizations devoted to safety in Massey's mines prior to the UBB disaster."[82]

---

[81] Compl. ¶¶ 235, 245. During argument, plaintiffs' counsel conceded that plaintiffs did not "have any allegations of when [Blankenship] sold stock," but then suggested that he obtained personal benefits by receiving salary, bonuses, and stock "along the way." Tr. Oral. Arg. 54-55. I have since reviewed the Complaint in its entirety and did not find any allegations that Blankenship, or any of the other defendants, received unusual compensation or otherwise personally profited to the detriment of any other stockholders of the Company as a result of the Company's alleged systemic disregard of safety regulations.

[82] Compl. ¶¶ 1, 236, 246.

When pressed to identify their best evidence of fraudulent conduct, plaintiffs' counsel focused on the allegation that Massey maintained "two sets of books" for recording safety violations, one for internal purposes and another that "routinely hid safety violations from the regulators though various illegal practices."[83] As troublesome as this allegation is, the alleged deception was perpetrated on regulators as part of the Company's failure to comply with safety regulations to the detriment of the Company—and not to the detriment of any individual stockholder.

Finally, plaintiffs point to the fact that a "federal judge did, in fact, find viable securities fraud claims" that "Alpha paid a sizeable sum [*i.e.*, $265 million] to settle."[84] This allegation is of no help to plaintiffs and just illustrates the difference between direct claims and what is pled here. The securities fraud settlement resolved claims on behalf of a class of purchasers and acquirers of Massey stock between February 1, 2008 and July, 2010 for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 as a result of alleged misstatements and omissions made during the class period.[85] The claims asserted in

---

[83] Oral Arg. Tr. 60-61; *see* Compl. ¶¶ 7, 53, 123.

[84] Def. Ans. Br. 31; Compl. ¶ 18 ("Alpha also subsequently settled class action securities lawsuits against Massey for $265 million").

[85] *See In re Massey Energy Co. Sec. Litig.*, 2014 WL 10750743, at *9 (S.D.W. Va. Feb. 19, 2014) (order granting preliminary approval of settlement).

the securities action thus were personal claims[86] intended to remedy harm to a specific group of stockholders.

Here, by contrast, plaintiffs' challenge to defendants' pre-Merger conduct boils down to a theory of mismanagement—very serious allegations of mismanagement to be sure—which would have survived in this action as a derivative *Caremark* claim if the Merger had not occurred, notwithstanding the challenges inherent in pleading such a claim under Rule 23.1 and our case law. But these allegations cannot be alchemized into a direct claim because, as discussed above, the duty implicated—to manage the affairs of Massey—was owed to the Company and not any stockholder individually, and the harm that allegedly resulted was to the Company and not any stockholder separately. For these reasons, Count I fails to state a claim of inseparable fraud and must be dismissed.

\* \* \* \* \*

---

[86] *See, e.g.*, *In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015) ("Quintessential examples of personal claims would include . . . a tort claim for fraud in connection with the purchase or sale of shares."); *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1126, 1138 (Del. 2016) (Strine, C.J.) (holding that holder claims "based on the plaintiff's continuing to hold the corporation's stock in reliance on the defendant's misstatements" are direct claims "analytically indistinct from seller and purchaser claims," and that *Tooley* does not apply because holder claims "are ones that only the holders can assert, not claims that could plausibly belong to the issuer corporation").

As noted above, then-Vice Chancellor Strine found in the context of deciding a motion for preliminary injunction in 2011 that "the record in this case does not support the notion that the Massey Board's pre-Merger conduct necessitated the Merger with Alpha."[87]  As defendants point out, this finding is directly at odds with the theory of inseparable fraud articulated in the *Countrywide* decisions, which flows from the premise that a merger was necessitated or made inevitable by the challenged pre-merger conduct.

Noting the procedure postural of the present motion to dismiss, plaintiffs argue that the Court must ignore this finding and should conclude based on the four corners of the Complaint that sufficient facts have been pled to support a reasonable inference that the Merger was the "direct and proximate result" of the conduct they challenge notwithstanding the Court's prior finding.[88]  The plaintiffs raise a valid procedural point, although it is telling that the current Complaint, which was filed well after the May 2011 Opinion, is noticeably thin on specific factual allegations that call into question then-Vice Chancellor Strine's finding.

Ultimately it is not necessary for me to address further this issue of causation, a subject that does not lend itself to easy resolution at the pleadings stage.  Given my determination that the pre-Merger conduct challenged in the Complaint does not

---

[87] *Massey*, 2011 WL 2176479, at *30 n.199.

[88] Compl. ¶¶ 240, 250.

support a direct claim in the first place, it is irrelevant whether or not it legitimately could be said that such conduct "necessitated" the Merger.

### 3.    A Few Words on Policy and *Corwin*

In a final effort to stave off dismissal, plaintiffs invoke public policy, arguing that "Massey's former stockholders should finally be given the opportunity to hold the Massey Board accountable for the damage they created."[89]  I agree that accountability is an imperative of our law, but adherence to principles governing derivative standing that have been repeatedly reaffirmed by our Supreme Court does not mean that defendants will not be held accountable for their actions at the helm of Massey.

As plaintiffs point out, the UBB disaster has led to a number of criminal convictions of Massey executives, including Blankenship, for their failure to comply with safety laws.  That is a form of accountability no civil court can provide.  Massey stockholders who possess legitimate direct claims arising from the events at issue, moreover, have been free to pursue appropriate recourse and indeed have obtained a measure of financial accountability, as evidenced by the $265 million securities fraud settlement Alpha entered into after the Merger.

It also must be recognized that there is another important policy at stake here. Alpha acquired the derivative claims in the Merger as a good faith purchaser for

---

[89] Pl.s' Br. at 8.

value. As then-Vice Chancellor Strine recognized six years ago, it would be problematic as a matter of equity to effectively carve those assets out of the Company that Alpha paid approximately $7 billion in cash and stock to acquire and thereby deprive Alpha of the ability to use the derivative claims to mitigate the considerable liabilities it assumed in acquiring Massey:

> Alpha will bear important ongoing costs to remedy the Disaster Fall-Out. The Derivative Claims are a tool by which Alpha can mitigate that liability. To divest Alpha of that tool and shift it to the Massey stockholders alone is therefore problematic as a matter of equity. So too would be exposing the Massey defendants to liability both to the former Massey stockholders and to Massey, through its new owners. [90]

Finally, for the sake of completeness, I briefly address defendants' reliance on *Corwin* as a separate ground for dismissal. The argument is mystifying to me. The fundamental policy underlying *Corwin*, and a wealth of prior precedents, is to avoid "judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction themselves." [91] That policy is not implicated here.

The Complaint does not challenge the economic merits of the Merger itself. It is not alleged, for example, that the Massey directors played favorites with any

---

[90] *Massey*, 2011 WL 2176479, at \*30 n.199.

[91] *Corwin*, 125 A.3d at 313.

45

bidder, erected improper defensive measures, or otherwise failed to maximize value for the Company's stockholders once a decision was made to consider strategic alternatives.[92]    Rather, as previously discussed, the Complaint challenges defendants' allegedly conscious disregard of safety laws over a period of several years and the harm it caused to the Company well *before* the Merger and the sale process that led to the Merger.

The policy underlying *Corwin*, to my mind, was never intended to serve as a massive eraser, exonerating corporate fiduciaries for any and all of their actions or inactions preceding their decision to undertake a transaction for which stockholder approval is obtained.  Here, in voting on the Merger, the Massey stockholders were asked simply whether or not they wished to accept a specified amount of Alpha shares and cash in exchange for their Massey shares or, alternatively, to stay the course as stockholders of Massey as a standalone enterprise, which would have allowed plaintiffs to press derivative claims.  Massey's stockholders were ***not*** asked in any direct or straightforward way to approve releasing defendants from any

---

[92] In a supplemental letter submission, plaintiffs argued that Massey's directors "took personal advantage of the sale [to Alpha] by negotiating unique indemnification provisions for themselves."  Pl.s' Feb. 6, 2017 Letter.  This assertion, which is not found in the Complaint, flies in the face of the finding in the May 2011 Opinion that "Alpha only promised to indemnify the Massey Board and management to the extent Massey itself could have and did in fact do so."  *Massey*, 2011 WL 2176479, at \*26.  Plaintiff later conceded the correctness of this finding.  Oral Arg. Tr. at 70.

liability they may have to the Company for the years of alleged mismanagement that preceded the sale process. Indeed, the proxy statement for the Merger implied just the opposite in stating that control over the derivative claims likely would pass to Alpha as a result of the Merger.[93] To top it off, if defendants' view of *Corwin* were correct, it would have the disconcerting and perverse effect of negating the value of the derivative claims that Alpha paid to acquire along with Massey's other assets.

In short, in order to invoke the cleansing effect of a stockholder vote under *Corwin*, there logically must be a far more proximate relationship than exists here between the transaction or issue for which stockholder approval is sought and the nature of the claims to be "cleansed" as a result of a fully-informed vote. For this reason, defendants' *Corwin* argument is flawed and does not provide a separate basis for dismissal of plaintiffs' claims.

## III.  CONCLUSION

For the foregoing reasons, the Complaint is hereby dismissed in its entirety.

**IT IS SO ORDERED.**

---

[93] *See Massey*, 2011 WL 2176479, at *14 ("the proxy statement makes clear that a vote for the Merger would likely result in control over the Derivative Claims passing to Alpha along with Massey's other assets").