**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| BROKERAGE JAMIE GOLDENBERG KOMEN REV TRU U/A 06/10/08 JAMIE L KOMEN TRUSTEE FOR THE BENEFIT OF JAMIE GOLDENBERG KOMEN, on behalf of itself and all others similarly situated, or, in the alternative, derivatively on behalf of FOX CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JAMES W. BREYER, RODERICK I. EDDINGTON, JAMES R. MURDOCH, K. RUPERT MURDOCH, LACHLAN K. MURDOCH, JACQUES NASSER, and ROBERT S. SILBERMAN,<br><br>Defendants,<br><br>and<br><br>FOX CORPORATION, a Delaware corporation,<br><br>Nominal Defendant. | C.A. No. 2018-0773-AGB |

**MEMORANDUM OPINION**

Date Submitted: March 17, 2020
Date Decided: June 26, 2020

Peter B. Andrews, Craig J. Springer, and David M. Sborz, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Brian J. Robbins and Stephen J. Oddo, ROBBINS LLP, San Diego, California; Steven J. Purcell, Douglas E. Julie, and Robert H. Lefkowitz, PURCELL JULIE & LEFKOWITZ LLP, New York, New

York; *Attorneys for Plaintiff Brokerage Jamie Goldenberg Komen Rev Tru U/A 06/10/08 Jamie L Komen Trustee for the Benefit of Jamie Goldenberg Komen.*

Blake Rohrbacher, Rudolf Koch, and Matthew W. Murphy, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Sandra C. Goldstein and Stefan Atkinson, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendants James W. Breyer, Roderick I. Eddington, James R. Murdoch, K. Rupert Murdoch, Lachlan K. Murdoch, Jacques Nasser, Robert S. Silberman, and Fox Corporation.*

**BOUCHARD, C.**

This case arises out of a two-step transaction in which Twenty-First Century Fox, Inc. ("Old Fox" or the "Company") spun off its news, sports, and broadcasting businesses to a newly listed public company, Fox Corporation ("New Fox"), and sold the rest of its businesses the next day to The Walt Disney Company for $71.6 billion in a merger transaction. The parties signed the original merger agreement in December 2017, but the transaction did not close until March 2019 due to regulatory review and an intervening bidding contest.

About five months before the transaction closed, an Old Fox stockholder filed a derivative lawsuit challenging an estimated $82.4 million in stock awards granted to Old Fox's three top executives—Rupert Murdoch and his two sons. The compensation committee of the Old Fox board approved these awards in anticipation of the transaction as part of a company-wide compensation program for Old Fox's senior executives. The gravamen of the complaint is that it was unnecessary and wasteful to approve any "incentive" compensation for the Murdochs because they already were highly incentivized to pursue and implement the transaction given their collective holdings of approximately $11.7 billion of Old Fox stock. The plaintiff's initial claims were for breach of fiduciary duty, unjust enrichment, and waste.

After the transaction closed, plaintiff filed an amended complaint that dropped its waste claim and asserted its remaining claims directly or, in the alternative, derivatively on behalf of New Fox. Defendants moved to dismiss the complaint,

1

contending, among other things, that plaintiff's claims are derivative and that it lost standing to bring them as a result of the transaction. The court agrees for the reasons explained below and thus will dismiss the complaint.

## I.    BACKGROUND

Unless otherwise noted, the facts recited in this opinion come from the allegations of the Verified Amended Class Action, or in the Alternative, Derivative Complaint ("Complaint") and documents incorporated therein.[1]  Any additional facts are subject to judicial notice.

### A.    The Parties

Plaintiff Brokerage Jamie Goldenberg Komen Rev Tru U/A 06/10/08 Jamie L Komen Trustee for the Benefit of Jamie Goldenberg Komen ("Plaintiff") owned shares of Old Fox Class A common stock from 2017 until the closing of the two-step transaction involving Old Fox, New Fox, and Disney (the "Transaction").[2]

---

[1] Verified Am. Compl. ("Compl.") (Dkt. 28).  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

Before filing this action, Plaintiff obtained documents from Old Fox under 8 *Del. C.* § 220 subject to the terms of an Agreement Governing the Production of Confidential Material. That agreement provides, in relevant part, that if Plaintiff files a complaint that "references any of the Produced Material, [Plaintiff] agrees that all of the Produced Material disclosed by the Company pursuant to this Agreement shall be incorporated by reference into any such complaint."  Andrade Aff. Ex. 3 ¶ 20 (Dkt. 37).

[2] Compl. ¶ 13.

Plaintiff received New Fox and Disney stock in the Transaction and continues to own this stock.[3]

Nominal Defendant New Fox is a Delaware corporation with its principal executive offices located in New York, New York.[4] New Fox is a news, sports, and entertainment company, which manages and reports business in three segments: Cable Network Programming, Television, and Other, Corporate and Eliminations.[5] These segments make up the assets and liabilities spun off from Old Fox on March 19, 2019.[6]

Defendants James W. Breyer, Roderick I. Eddington, Jacques Nasser, and Robert S. Silberman served on the board of directors of Old Fox and on the Compensation Committee of the Old Fox board that approved the challenged stock awards.[7] Breyer, Eddington, and Silberman did not join the Disney board or the New Fox board after the Transaction closed. Nasser serves on the New Fox board.[8]

Defendants K. Rupert Murdoch ("Rupert"), Lachlan K. Murdoch ("Lachlan"), and James R. Murdoch ("James") (collectively, the "Murdochs") served on the Old

---

[3] *Id.*

[4] *Id.* ¶ 14.

[5] *Id.*

[6] *Id.* ¶¶ 2, 14.

[7] *Id.* ¶¶ 18-22.

[8] *Id.* ¶ 114.

Fox board and as officers of Old Fox.[9]  James served as Chief Executive Officer, and Rupert and Lachlan served as Executive Co-Chairmans of Old Fox.[10]  After the Transaction closed, James did not join Disney or New Fox.[11]  Both Rupert and Lachlan joined New Fox where Rupert currently serves as Chairman and Lachlan serves as CEO and Executive Chairman.[12]  As of February 20, 2018, the Murdochs collectively owned shares of Old Fox common stock worth over $11.7 billion, consisting of more than 306 million shares of voting Class B common stock and 10.9 million shares of Class A common stock, which voted only on certain matters.[13] The Murdoch's ownership of Class B common stock gave them 38.9% voting power on matters for which the Class A common stock possessed no voting rights.[14]

## B.    Preliminary Negotiations with Disney

In August 2017, Rupert and Robert Iger, the Chairman and CEO of Disney, discussed the possibility of a strategic transaction involving Disney and Old Fox.[15] From September through October 2017, Disney and Old Fox negotiated a division

---

[9] *Id.* ¶¶ 15-17.

[10] *Id.*

[11] *Id.* ¶ 7.

[12] *Id.* ¶¶ 15-16.

[13] *Id.* ¶¶ 24, 54.

[14] *Id.* ¶ 25.

[15] *Id.* ¶ 40; *see also* Andrade Aff. Ex. 2 (Schedule 14A Definitive Proxy Statement filed on June 28, 2018) ("Proxy"), at 116.

of Old Fox's assets between Disney and New Fox, taking into account the regulatory risks accompanying any division.[16] The negotiations with Disney primarily were undertaken by the three Murdochs (Rupert, Lachlan, and James); John P. Nallen, Senior Executive Vice President and Chief Financial Officer of Old Fox; and Gerson Zweifach, Senior Executive Vice President and Group General Counsel of Old Fox (collectively, the "Named Executive Officers").[17]

Old Fox ceased negotiations with Disney in late October 2017 but reengaged in early November after Comcast Corporation sent Old Fox an indication of interest to acquire the same assets Disney was considering buying.[18] From November 7 to December 6, Old Fox negotiated with both Comcast and Disney.[19] On December 6, 2017, the Old Fox board decided to end negotiations with Comcast and directed management to finalize a deal with Disney.[20]

## C. The Compensation Committee Information Call

On the evening of December 11, 2017, the Compensation Committee held an information call to consider "management's proposal" for the "treatment of equity,

---

[16] Proxy at 116-18.

[17] Compl. ¶ 40.

[18] Proxy at 118-19.

[19] *Id.* at 119-27.

[20] *Id.* at 127.

the formula for the retention incentives and severance plan framework" (the "Compensation Terms") in connection with the Transaction.[21]  Present for the call from the Company were two members of the Compensation Committee (Breyer and Nasser), Nallen, Zweifach, and Thomas Gaissmaier, Old Fox's Executive Vice President and Chief Human Resources Officer.[22]  Also present was Claude Johnston of Frederic W. Cook & Co, an executive compensation consulting firm.[23]

The Compensation Terms included a special grant of restricted stock units ("RSUs") as part of a Company-wide retention program (the "Retention RSUs") and a modification to performance stock unit ("PSU") awards for the 2016-18 performance period (the "Performance Award Modification").[24]  During the information call, Gaissmaier and Johnston "reviewed and discussed in detail with [Breyer and Nasser] the Compensation Terms, including the purpose of each element and how they compared to analogous provisions in other transactions, and the estimated impact of the Compensation Terms on the Company's named executive officers."[25]

---

[21] Compl. ¶¶ 76-77.

[22] *Id.*

[23] *Id.* ¶ 76.

[24] *Id.* ¶¶ 78-79; Andrade Aff. Ex. 6 (Compensation Committee Information Call Minutes, dated December 11, 2017) ("Information Call Minutes"), at 21CF-KOMEN_00000002-3.

[25] Compl. ¶ 80 (alteration in original) (quoting Information Call Minutes).

Breyer and Nasser both expressed support for management's compensation proposal during the information call.[26]  A third member of the Compensation Committee (Eddington), who reviewed the materials before the call, "had already conveyed his support to Breyer" and the fourth member (Silberman) conveyed his support after the call.[27]  The Compensation Committee thus supported including the Compensation Terms, "substantially in the form presented to the Committee members," in a merger agreement to be considered by the Old Fox board on December 13, 2017.[28]

### D.    The Original Merger Agreement

On December 13, 2017, Old Fox entered into a merger agreement with Disney (the "Original Merger Agreement").[29]  Under the Original Merger Agreement, Old Fox would enter into a separation agreement with New Fox to transfer its news, sports, and broadcast businesses to New Fox (the "New Fox spinoff").[30]  In connection with the New Fox spinoff, Old Fox would distribute all of the issued and outstanding common stock of New Fox to its stockholders, on a *pro rata* basis, with

---

[26] *Id.* ¶ 82.

[27] *Id.* (internal quotation marks omitted).

[28] *Id.*

[29] *Id.* ¶ 35.

[30] Proxy at 107; Compl. ¶ 14.

7

each share of Old Fox receiving one-third of a share of New Fox.[31] After the New Fox spinoff, Disney would acquire Old Fox's remaining assets, including its movie and television studios, for approximately $52.4 billion in Disney common stock (the "Disney Merger").[32] Upon completion of the Disney Merger, each issued and outstanding share of Old Fox would be exchanged for 0.2745 shares of Disney common stock and Old Fox would become a wholly-owned subsidiary of Disney.[33]

On December 14, 2017, the Murdochs sent a letter to their "Colleagues" at Old Fox in connection with the announcement of the Transaction.[34] The letter explained that, although Old Fox had agreed to the Transaction, "it will be 12-18 months before the spin-off and the combination with Disney are complete."[35]

### E. The Compensation Committee Formally Approves the Retention RSUs and Performance Award Modification

On February 20, 2018, the Compensation Committee formally consented to and adopted resolutions by unanimous written consent to implement the Compensation Terms they had reviewed in December 2017.[36] Those Compensation

---

[31] Compl. ¶ 2.

[32] *Id.*

[33] *Id.* ¶ 35.

[34] *Id*. ¶ 53; Andrade Aff. Ex. 4 (Old Fox Letter, dated December 14, 2017, filed with the Securities Exchange Commission).

[35] Andrade Aff. Ex. 4, at 2; *see also* Pl.'s Opp'n Br. 11 (Dkt. 42).

[36] Compl. ¶ 85; Andrade Aff. Ex. 7 ("Feb. Written Consent").

Terms included the issuance of the Retention RSUs and the Performance Award Modification.

As to the first action, the Compensation Committee approved a "[r]etention RSU grant of 5.8 million units to certain senior executives and established a $110 million cash-based retention program for certain employees."[37] As part of the retention program, the five Named Executive Officers received 1,943,650 RSUs, of which the Murdochs received 1,500,473 RSUs.[38] The RSUs awarded to the Named Executive Officers were part of a Company-wide retention program designed "to incentivize key employees who might consider leaving Old Fox and its successors due to uncertainty about their future roles to continue their employment through the completion of the [Transaction] and for a period of time thereafter."[39]

The Retention RSUs were structured to vest in two equal tranches over a period of more than two years. Specifically, the first half would vest immediately before the Transaction closed, which was expected to occur twelve to eighteen months after the announcement of the Original Merger Agreement in December 2017, and the second half would vest on the fifteenth month anniversary of the Transaction subject to "each recipients continued service."[40] The Retention RSUs

---

[37] Compl. ¶ 46 (quoting Proxy at 281).

[38] *Id.* ¶ 47.

[39] *Id.* ¶ 51 (internal quotation marks omitted).

[40] *Id.* ¶¶ 4, 48-49.

9

would equal two times the value of each executive's respective target PSU award for the 2018-2020 performance period and were issued on the condition that recipients would not be eligible to receive PSU awards for the 2019-2021 performance period that they otherwise may have been eligible to receive.[41]

The Performance Award Modification changed the performance terms of the PSU awards for the 2016-2018 performance period, which the Compensation Committee previously granted on August 3, 2015 under Old Fox's 2013 Long-Term Incentive Plan.[42] The Compensation Committee designed and approved annual awards of PSUs as part of Old Fox's 2013 Long-Term Incentive Plan to provide executives the opportunity to earn shares of Old Fox stock based on the degree to which various performance goals were achieved during a three-year performance period.[43]

The PSU Awards for the 2016-2018 performance period were governed by three performance metrics: (i) average annual adjusted earnings per share growth; (ii) average annual adjusted free cash flow growth; and (iii) Old Fox's three-year total stockholder return as measured against the three-year total stockholder return

---

[41] *Id.* ¶ 55; Information Call Minutes, at 21CF-KOMEN_00000003; Feb. Written Consent, at 21CF- KOMEN_00000309; Andrade Aff. Ex. 1 ("Sept. Proxy") at 40.

[42] Compl. ¶¶ 58-59; Sept. Proxy at 51.

[43] Compl. ¶ 58; *see also* Sept. Proxy at 37-38.

of the companies that comprise the S&P 500 Index.[44]   Each of the performance

metrics had a corresponding performance level: "threshold," "target," or

"maximum."[45]     Following the conclusion of a performance period, the

Compensation Committee would certify the extent to which the performance goals

were achieved and determine the payout.[46]  The performance period for the 2016-

2018 PSU Awards was scheduled to end on June 30, 2018, after the announcement

of the Original Merger Agreement and before any transaction with Disney was

expected to close.[47]

The Performance Award Modification amended the terms of the PSU awards

for the 2016-2018 performance period to provide for a payout to participants at the

"target" performance level.  On February 22, 2018, Old Fox filed a Form 8-K

disclosing that this amendment would apply to "all participants in the PSU award

program" and listing the number of shares that each of the Named Executive Officers

would receive in accordance with the amendment:

---

[44] Compl. ¶ 61.

[45] *Id.* ¶ 62.

[46] *Id.* ¶ 63.

[47] *Id.* ¶ 60.

11

> [O]n February 20, 2018, the [Compensation Committee] determined that the outstanding [PSU] awards for the fiscal 2016-2018 performance period granted to all participants in the PSU award program, including the Company's named executive officers, shall vest based on the target number of PSUs awarded in accordance with the original vesting schedule. Upon vesting, the named executive officers will receive shares of the Company's Class A Common Stock as follows: 173,094 (K. Rupert Murdoch), 273,307 (Lachlan K. Murdoch), 273,307 (James R. Murdoch), 121,469 (John P. Nallen) and 75,918 (Gerson Zweifach).[48]

This same Form 8-K disclosed that the purpose of the Performance Award Modification was "to help align executive compensation with the interests of Old Fox's shareholders by strengthening retention incentives for key employees at a time of uncertainty while the Company completes the [Transaction] on an accelerated timeline and during a time of substantial change."[49]

Based on the $37.13 per share closing price of Old Fox Class A common stock on February 20, 2018, the 1,500,473 RSUs the Murdochs were eligible to receive were worth approximately $55.7 million.[50] Based on the same assumption, the 719,708 shares of Old Fox they would receive in accordance with the Performance

---

[48] *Id.* ¶ 64 (quoting February 22, 2018 Form 8-K). The parties dispute whether the Compensation Committee required the PSUs to be paid at target regardless of meeting any performance metric. Defendants contend they did; Plaintiffs contend they did not. This dispute is irrelevant to the court's disposition of the pending motion.

[49] *Id.* ¶ 69 (internal quotation marks and alternations omitted)

[50] *Id.* ¶ 47.

Award Modification were worth approximately $26.7 million.[51] Thus, according to Plaintiff, implementation of the Compensation Terms yielded the Murdochs a total of $82.4 million.[52]

### F. The Disney Merger and New Fox Spinoff

On June 13, 2018, Comcast sent the Old Fox board a proposal to purchase for $35 per share in cash, or a total value of $65 billion, the same assets that Disney had agreed to buy.[53] On June 19, Disney revised its bid to increase the consideration from $52.4 billion to a total value of $71.3 billion, which would provide Old Fox stockholders approximately $38 per share to be paid roughly half in cash and half in shares of Disney common stock.[54] On June 20, Disney and Old Fox entered into an Amended and Restated Agreement and Plan of Merger documenting the revised

---

[51] *Id.* ¶ 67.

[52] This $82.4 million figure does not take into account any potential offsets to the value of the Retention RSU or the effect of the Performance Award Modification. For example, recipients of the RSUs became ineligible to receive PSU awards for the 2019-2021 performance period and the PSU awards for the 2016-2018 performance period may have paid out at "target" or a higher threshold (*i.e.*, "maximum) had the modification not been made, particularly in light of the announcement of the Transaction. For purposes of this decision, the court accepts Plaintiff's $82.4 million estimate.

[53] Proxy at 131.

[54] Compl. ¶ 37; Proxy at 133.

proposal.[55] On July 27, 2018, Old Fox stockholders approved the Transaction with the approval of over 99% of those voting.[56]

On August 15, 2018, the PSUs for the 2016-2018 performance period were paid out at target, consistent with the Performance Award Modification, with 917,095 shares of Old Fox Class A Common Stock issued to the Named Executive Officers.[57] Lachlan, James, and Rupert received 273,307, 273,307, and 173,094 shares of Old Fox Class A common stock, respectively.[58]

On March 19, 2019, Old Fox spun-off New Fox as a newly listed public company and issued its stockholders all of the issued and outstanding common stock of New Fox, with each share of Old Fox receiving one-third of a share in New Fox.[59] The next day, on March 20, 2019, the Disney Merger closed.[60]

Upon completion of the Transaction, (i) the Old Fox shares the Murdochs received in August 2018 under the PSU plan were exchanged for cash or Disney shares as part of the Disney Merger and for New Fox shares as part of the New Fox spinoff and (ii) each RSU was converted into both a New Fox RSU and a Disney

---

[55] Compl. ¶ 37.

[56] Compl. ¶ 39; Andrade Aff. Ex. 10 (Form 8-K of Old Fox, dated July 27, 2018), at 2.

[57] Compl. ¶ 72.

[58] *Id.*

[59] *Id.* ¶ 38.

[60] *Id.* ¶ 37.

RSU, relative to the number of New Fox shares and Disney shares that a share of Old Fox Class A common stock received in the Transaction, which could be settled in either cash or stock upon vesting.[61]

## II. PROCEDURAL HISTORY

On October 24, 2018, Plaintiff filed its Verified Stockholder Derivative Complaint, which asserted three derivative claims on behalf of Old Fox.[62] Count I asserted a claim for breach of fiduciary duty against the Named Executive Officers for accepting the challenged stock awards and against the Compensation Committee for awarding them.[63] Count II asserted an unjust enrichment claim against the Named Executive Officers for retaining the challenged stock awards.[64] Count III asserted a waste claim against the Compensation Committee for "caus[ing] the Company and New Fox to waste valuable corporate assets by approving the Retention RSU Grants and the Performance Award Modification."[65]

On June 7, 2019, after the Transaction closed, Plaintiff filed an amended pleading styled as a "Verified Amended Class Action, or in the Alternative,

---

[61] *Id.* ¶¶ 49, 72.

[62] Dkt. 1 ("Original Compl.").

[63] *Id.* ¶¶ 110-15.

[64] *Id.* ¶¶ 116-22.

[65] *Id.* ¶¶ 123-27.

Derivative Complaint" (as defined above, the "Complaint").[66]   The Complaint asserts three claims on behalf of a putative class of Old Fox stockholders or, in the alternative, "derivatively on behalf of New Fox."[67]   Counts I and II assert claims for breach of fiduciary duty against the Murdochs as "controlling stockholders of Old Fox" and against the members of the Compensation Committee for "faithlessly allowing the Murdochs to extract from [Old Fox's] sale process unique benefits."[68]  Count III asserts an unjust enrichment claim against the Murdochs for retaining the challenged stock awards.[69]   In amending its pleading, Plaintiff dropped its waste claim and all of its claims against two of the Named Executive Officers:  Nallen and Zweifach.[70]

On July 18, 2019, Defendants moved to dismiss the Complaint in its entirety under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief and Rule 23.1 for failure to plead demand futility.[71]   The court heard argument on February 28, 2020, and received supplemental letters thereafter.

---

[66] Compl.

[67] *Id.* ¶ 95.

[68] *Id.* ¶¶ 120-32.

[69] *Id.* ¶¶ 133-38.

[70] *Compare* Original Compl. ¶¶ 110-22, *with* Compl. ¶¶ 120-25, 133-38.

[71] Dkt. 10; Dkt. 36.

## III. ANALYSIS

Defendants' motion raises several issues. As a threshold matter, Defendants contend that all of the claims in the Complaint, which are styled as "direct" claims, are actually derivative in nature. From this premise, Defendants advance two lines of argument. First, Defendants argue that Plaintiff does not have standing to bring derivative claims on behalf of New Fox because Plaintiff was not a stockholder of New Fox at the time of the challenged stock awards. Second, Defendants argue as an independent matter that Plaintiff failed to make a pre-suit demand on the New Fox Board or to allege facts sufficient to show that making a demand would have been futile under Delaware law. Defendants also contend that Plaintiff has failed to state a claim for relief whether the claims are direct or derivative.[72]

Plaintiff's opposition presents its own array of issues. To begin, Plaintiff contends its claims may be brought as direct claims (i) on the theory that the Murdochs improperly diverted to themselves assets of Old Fox during the sale process that reduced the consideration paid to its stockholders in the Transaction and (ii) because Defendants violated an "equal treatment" provision in Old Fox's

---

[72] With respect to Count III, Defendants argue that "Plaintiff's unjust enrichment allegations are nothing more than a recasting of its fiduciary duty allegations" and the court should treat both claims "in the same manner when resolving a motion to dismiss." Defs.' Opening Br. 58 (internal quotation marks and citations omitted) (Dkt. 36). Plaintiff did not address this argument in its brief and thus waived the issue. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.") (citations omitted).

certificate of incorporation. Plaintiff also contends that, even if its claims are derivative, it has standing to pursue them and the making of a demand would have been futile. Finally, Plaintiff contends it has stated an entire fairness claim and, even if the court were to apply the business judgment rule, the Complaint states a claim that the Compensation Committee acted in bad faith.[73]

The standards governing a motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[74]

---

[73] Apart from its arguments on the merits, Plaintiff asserts that Defendants' motion should be denied "because it relies extensively on 'facts' inconsistent with" and outside the Complaint. Pl.'s Opp'n Br. 16. Specifically, Plaintiff objects to references in Defendants' opening brief to three parts of the Proxy that Plaintiff has not "endorsed as truthful." *Id.* at 17. Plaintiff raises a valid concern reflective of the tendency of litigants in this court to rely frequently on matters outside the pleadings when presenting a motion to dismiss, which may result in the court treating the motion as one for summary judgment. *See* Ch. Ct. R. 12(b); *In re Walt Disney Company Derivative Litigation*, 825 A.2d 275, 278 (Del. Ch. 2003). The court does not do so here because it has excluded the three disputed references to the Proxy from its consideration of the motion to dismiss.

[74] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotation marks and citations omitted).

For the reasons discussed below, the court concludes that Plaintiff's claims are derivative in nature and that Plaintiff lacks standing to bring them. Accordingly, the Complaint must be dismissed for failure to state a claim for relief.

### A.  Plaintiff Does Not State a Direct Claim under *Parnes*

The threshold question of Defendants' motion is whether Plaintiff's claims are derivative or direct. In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, our Supreme Court held that whether a claim is derivative or direct, "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[75] To proceed with a direct claim, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[76]

In applying the *Tooley* test, "the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint."[77] "Where all of a corporation's stockholders are harmed and would recover *pro rata* in

---

[75] 845 A.2d 1031, 1033 (Del. 2004).

[76] *Id.* at 1039.

[77] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 817 (Del. Ch. 2005) (internal citation and quotation marks omitted), *aff'd*, 906 A.2d 766 (Del. 2006).

proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."[78]

"Application of these principles assumes heightened significance in the post-merger context" because stockholders typically lose standing to pursue derivative claims when a merger extinguishes their status as stockholders under the continuous ownership rule.[79] That rule provides, with two recognized exceptions, "that a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at the time of commencement of suit but that he must also maintain shareholder status throughout the litigation."[80] As this court has observed, "[i]n the context of a merger transaction, the derivative-individual distinction is essentially outcome-determinative of any breach of fiduciary duty claims that can be asserted in connection with the merger by the target company stockholders."[81]

In *Parnes v. Bally Entertainment Corp.*, the Supreme Court articulated a rule whereby a plaintiff whose status as a stockholder was extinguished in a merger may still pursue breach of fiduciary duty claims post-merger: "A stockholder who

---

[78] *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

[79] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *10-12 (Del. Ch. June 25, 2018), *aff'd sub nom. IDT Corp. v. JDS1, LLC*, 206 A.3d 260 (Del. 2019).

[80] *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984). The two recognized exceptions to the continuous ownership rule are discussed below in Part III.C.

[81] *Golaine v. Edwards*, 1999 WL 1271882, at *4 (Del. Ch. Dec. 21, 1999) (Strine, V.C.).

directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a [direct] claim even after the merger at issue has been consummated."[82]   Although a seemingly straightforward rule, the *Parnes* court recognized "that it is often difficult to determine whether a stockholder is challenging the merger itself, or alleged wrongs associated with the merger."[83]  As other judges faced with this task have done,[84] the court turns to review the case law that illuminates the application of the principles underlying *Parnes* and its progeny before analyzing Plaintiff's allegations here.

### 1.    *Parnes* **and its Progeny**

Over a decade before *Parnes*, in *Kramer v. Western Pacific Industries, Inc.*, our Supreme Court considered the derivative-individual distinction in the context of a merger transaction.[85]  In *Kramer*, a stockholder asserted that two directors of the target corporation who also served as the company's "two principal executives" breached their fiduciary duties by, among other things, "diverting to themselves eleven million dollars of the [transaction] proceeds through their receipt of stock

---

[82] 722 A.2d 1243, 1245 (Del. 1999).

[83] *Id.*

[84] *See Golaine*, 1999 WL 1271882, at *4-8; *In re Straight Path*, 2018 WL 3120804, at *10-12.

[85] 546 A.2d 348 (Del. 1988).

options and golden parachutes" several months before the merger.[86] The stockholder did not attack the merger price as unfair or allege that the sales process was tainted.[87] Rather, "[h]is principal contention for sustaining an individual, as distinguished from a derivative claim, is that the effect of the defendants' acts of waste was to reduce the common shareholders' net distributive share of an otherwise adequate [transaction] price."[88] Finding that the focus of Kramer's attack was "upon waste through allegedly excessive payments . . . incurred prior to the . . . merger," the Supreme Court concluded that, "[h]aving not directly attacked the merger, Kramer's claim of diversion of funds and excessive payments clearly does not rise to an attack on the merger itself sufficient for his suit to survive the merger."[89]

In contrast to *Kramer*, the *Parnes* court held that a stockholder could directly pursue its claims post-merger because a fiduciary extracted for himself "valuable [corporate] assets" while the corporation was engaging in a sale process.[90]

---

[86] *Id.* at 350. The Western Pacific board approved the golden parachutes on June 23, 1986, a little more than three months before the sale process ended on October 3, 1986. *Id.* The board approved the stock options much earlier, in June 1985, but conditioned them on stockholder approval that did not occur until May 1986. *Id.* at 349.

[87] *Id.* at 354; *see also id.* at 350 n.2 ("Kramer does not dispute the adequacy of the tender offer/merger price. He agrees that the tender offer and merger resulted from a competitive bidding contest . . . .").

[88] *Id.* at 350 n.2.

[89] *Id.* at 354.

[90] 722 A.2d at 1245-46.

Specifically, the Chairman and CEO of Bally Entertainment Corporation "allegedly informed all potential acquirors that his consent would be required for any business combination with Bally and that, to obtain his consent, the acquiror would be required to pay [him] substantial sums of money and transfer to him valuable Bally assets."[91] These assets included increased severance, loan forgiveness, and a below fair value warrant to purchase stock in an affiliate.[92] The *Parnes* court reasoned that unlike in *Kramer*, the fiduciary's demands scared off other bidders who "might have paid a higher price" for the corporation, and "by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price," the plaintiff was permitted to sue directly.[93]

The same year *Parnes* was decided, this court considered the derivative-individual distinction in the context of another merger transaction in *Golaine v. Edwards*.[94] There, a stockholder of Duracell International, Inc. challenged a $20 million payment made to Kohlberg Kravis Roberts & Co., L.P. ("KKR") in connection with a merger between Duracell and The Gillette Company with an implied value of $8.3 billion. An affiliate of KKR owned 34% of Duracell before

---

[91] *Id.*

[92] *Id.* at 1246.

[93] *Id.* at 1245.

[94] 1999 WL 1271882.

the merger and two of KKR's principals who served on the Duracell board allegedly "conducted the merger negotiations with Gillette."[95] KKR received the $20 million fee even though it "was never formally retained by the Duracell board as an investment bank and was acting . . . primarily for its own account."[96]

After thoughtfully analyzing *Kramer* and *Parnes*, then-Vice Chancellor Strine observed that the "derivative-individual distinction . . . is revealed as primarily a way of judging whether a plaintiff has stated a claim on the merits."[97] He then opined that *Parnes* stood for "the following basic proposition: a target company stockholder cannot state a claim for breach of fiduciary duty in the merger context unless he adequately pleads that the merger terms were tainted by unfair dealing."[98]

Noting that "there are countless issues to be figured out" in a merger negotiation, the court went on to explain how it cannot be the case that every payment to an insider in a merger transaction would support a derivative claim:

[95] *Id.* at *1.

[96] *Id.* at *3.

[97] *Id.* at *7.

[98] *Id.*

24

It cannot be that the mere fact that an insider (or the affiliate of an insider) received a payment in connection with the merger in itself provides a sufficient basis for a target stockholder plaintiff to state an individual claim based on the simple syllogism that:

>1. the payment was part of the total consideration the acquiror was willing to pay;

>2. the target board had a duty to ensure that the payment's worth was spread equally to all the stockholders; and

>3. the target board's failure to do so therefore constituted unfair dealing tainting the merger.[99]

As the *Golaine* court observed, this syllogism was "nearly identical" to the logic of plaintiff's principal argument in *Kramer*, which the Supreme Court rejected.[100] Instead, "[u]nder *Parnes* and *Kramer,* the target stockholder plaintiff must, at the very least, allege facts showing that the side payment improperly diverted proceeds that would have, if the defendant directors had acted properly, ended up in the consideration paid to the target stockholders."[101]

The *Golaine* court found "nothing in the complaint that supports the notion that KKR took anything off the table that would have otherwise gone to all the

---

[99] *Id.* at *9.

[100] *Id.*

[101] *Id.*; *see also In re First Interstate Bancorp Consol. S'holders Litig.*, 729 A.2d 851, 861 (Del. Ch. 1998) ("Delaware law is well-settled that claims arising from transactions involving corporate assets that allegedly operate to reduce the consideration received by stockholders in a merger are, in the absence of [special] circumstances . . . derivative in nature.").

Duracell stockholders."[102]  It thus concluded that the complaint failed to state a claim "that the $20 million fee to KKR tainted the merger negotiation process or the merger terms so as to render th[e] transaction unfair to Duracell's non-KKR stockholders" and, accordingly, that the complaint failed "to state an individual claim" that could survive the merger.[103]

In *Tooley*, the Delaware Supreme Court expressly affirmed the reasoning in *Kramer* and *Parnes*.[104]  Over a decade later, Vice Chancellor Glasscock twice addressed the derivative-individual distinction in the context of merger transactions.

In *Houseman v. Sagerman*, two stockholders of Universata, Inc. challenged various aspects of its merger with a subsidiary of HealthPort Technologies, LLC.[105] In particular, plaintiffs alleged that "*after* negotiating the sale price, the Board amended the 2008 Equity Incentive Plan . . . to vest warrants which would otherwise have lapsed" in order to divert "to directors over $300,000 (and perhaps significantly more) of the previously-negotiated merger consideration, in the context of total

---

[102] 1999 WL 1271882, at *1, 9.

[103] *Id.* at *1.

[104] *Tooley*, 845 A.2d at 1033, 1039 ("The proper analysis has been and should remain that stated in . . . *Kramer* and *Parnes*.  That is, a court should look to the nature of the wrong and to whom the relief should go.  The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.").

[105] 2014 WL 1600724 (Del. Ch. Apr. 16, 2014).

merger consideration so small that the Board concluded that a fairness opinion costing $250,000 could not be justified."[106]

Citing *Golaine*, the court explained that to state a direct claim that would survive the merger, "the plaintiff must plead facts supporting . . . an *improper* diversion and that, absent the impropriety, the consideration would have gone to the stockholders."[107] The court concluded that the pleadings satisfied this test because they could be understood to "allege that the warrants arose in a context which constituted self-dealing; that a second, post-merger-negotiation action by the Board causing those warrants to vest rather than lapse was further self-dealing, conferring a benefit on the directors not shared by the stockholders; and that the diversion was material in the context of the consideration at issue."[108]

In *In re Straight Path Communications*, the court concluded the stockholders had successfully pleaded a direct claim that the controller of a target corporation had "improperly diverted merger consideration that otherwise would have gone to the stockholders" by extracting unique benefits for himself in the form of the settlement of an indemnification claim.[109] Vice Chancellor Glasscock explained:

---

[106] *Id.* at *13.

[107] *Id.*

[108] *Id.*

[109] 2018 WL 3120804, at *13.

Here, the indemnification right did not fully ripen until the sale, and the leverage used by the controller included a threat to nix the transaction unless corporate assets were first transferred to his affiliates for a manifestly unfair price, but for which the consideration received by the stockholders upon sale would have included both the price paid by the purchaser and the beneficial ownership of the litigation trust. I find the transfer of the indemnification claim to the controller here to be sufficiently intertwined with the sale of the company and the assets received by stockholders therefrom to state a claim that the sales transaction was unfair. That claim is direct and may proceed.[110]

Significantly, the settlement of the indemnification claim "effectively deprived the company's stockholders of a claim potentially worth over half a billion dollars as part of the sale of the company" that was valued at $3.1 billion.[111]

With the foregoing principles in mind, the court next considers the allegations of the Complaint.

### 2. Plaintiff's Claims are Derivative

Defendants contend that all of Plaintiff's claims "are essentially claims for corporate waste based on excessive compensation . . . [that] Delaware courts have time and again found to be purely derivative."[112] According to Defendants, Plaintiff cannot transform these claims into direct claims because Plaintiff raises no challenge to the Transaction itself, "including the process or price associated" with it.[113]

---

[110] *Id.* at *1.

[111] *Id.* at *13.

[112] Def.'s Opening Br. 26.

[113] *Id.* at 28.

Plaintiff counters that the Complaint states direct claims under *Parnes* and its progeny because it describes "a procedurally and substantively unfair transaction through which the Murdochs extracted an additional $82.4 million in the form of: (i) 'performance' awards stripped entirely of performance criteria; and (ii) time-vesting RSUs valued at twice the amount of the Murdochs' typical three-year performance-vesting awards."[114] According to Plaintiff, "[i]f the Murdochs did not extract this benefit for themselves, the consideration paid by Disney would have been shared by fewer Old Fox shares and the ownership of New Fox would have been split fewer ways."[115]

In analyzing Plaintiff's claims, the court is not bound by labels used in the pleadings, but "must look at all the facts of the complaint and determine for itself whether a direct claim exists."[116] For the reasons that follow, the court concludes that Plaintiff's claims are derivative because the Complaint fails to plead adequately that Defendants caused the terms of the Transaction to be tainted by unfair dealing.

To begin, it is helpful to focus on the subject of Plaintiff's challenge: the proposal that the Compensation Committee approved. That proposal, unlike the transactions challenged in the *Parnes* line of cases discussed above, did not solely

---

[114] Pl.'s Opp'n Br. 25.

[115] *Id.* 19-20.

[116] *In re Massey Energy Co. Deriv. & Class Action Litig.*, 160 A.3d 484, 502 (Del. Ch. 2017) (internal citation and quotation marks omitted).

benefit a putative controller or a key fiduciary. Rather, the Compensation Committee approved a proposal with two components that were much more far-reaching. First, the Compensation Committee authorized the grant of 5.8 million RSUs as part of a Company-wide program to retain senior executives, which vested in two tranches over a period of two-plus years and which replaced any PSU awards for the 2019-2021 performance period.[117] Second, it modified for all participants in the PSU award program the performance level term of pre-existing PSU awards for the 2016-2018 performance period that was scheduled to end in June 2018, between the public announcement of the Original Merger Agreement and the expected closing of the Disney Merger.[118]

To be sure, the Murdochs were significant beneficiaries of the proposal that the Compensation Committee approved. They received, for example, approximately 26% of the 5.8 million Retention RSUs.[119] But the broader scope and nature of the actions the Compensation Committee adopted suggests they were, as the *Golaine* court put it, among those "countless issues" that legitimately would need "to be figured out" during a sale process.[120] Indeed, for anyone other than the Murdochs,

---

[117] *See supra* Part I.E.

[118] *Id.*

[119] It is unclear from the Complaint what percentage the Murdochs held of the total number of PSUs for the 2016-2018 performance period.

[120] *Golaine*, 1999 WL 1271882, at *9.

the Complaint does not challenge the bottom line effect or the rationale of the Compensation Committee's decision to grant the Retention RSUs (74% of which went to other senior executives of Old Fox) or to modify the PSU awards for the 2016-2018 performance period.

Insofar as the Murdochs are concerned, the critical deficiency in the Complaint is the lack of any factual allegations suggesting a causal link between the Murdochs' receipt of the challenged compensation awards and any unfair dealing in negotiating the terms of the Transaction. Significantly, the Complaint is devoid of factual allegations challenging the *bona fides* of the sale process, which involved a heated bidding contest between Disney and Comcast. The Complaint does not contend, for example, that the Old Fox board played favorites between the bidders or that the process failed to yield a fair price.

Instead, the factual allegations of the Complaint focus on the Compensation Committee's internal process, which Plaintiff alleges was hasty and superficial,[121] and the allegedly "absurd" rationale for awarding the Murdochs "additional compensation awards as incentives" given that they owned "over $11.7 billion of Old Fox common stock."[122] But both of these criticisms are plead without regard to, and independent of, the sale process and the negotiations that resulted in the

---

[121] Compl. ¶¶ 84, 86, 101.

[122] *Id.* ¶¶ 4, 7; *see also id.* ¶¶ 51, 53-54.

Transaction. Put another way, Plaintiff has not alleged facts that support a reasonable inference that Defendants "*improperly* diverted proceeds that would have, if they had acted properly, ended up in the consideration paid to the target stockholders."[123]

Unlike in *Parnes* and *Straight Path*, missing from the Complaint are any facts to support a reasonable inference that the Murdochs refused to negotiate or impeded the negotiation of a transaction unless and/or until they received the challenged stock awards. This case also bears no resemblance to *Houseman*, where the directors engaged in self-dealing to extract additional payments *after* the merger consideration had been fixed such that the extracted payments necessarily came at the expense of other stockholders. Each of these cases also involved another important fact suggestive of unfair dealing that is not present here—the diversion from the transaction of a material amount of proceeds.[124]

---

[123] *Golaine*, 1999 WL 1271882, at *9.

[124] *See Parnes* 722 A.2d at 1245 (CEO demanded "substantial sums of money and . . . valuable [corporate] assets" to obtain his consent to a transaction, which deterred competing bidders); *Houseman*, 2014 WL 1600724, at *13 (directors diverted at least $300,000 to themselves where the merger consideration was "so small that the Board concluded a fairness opinion costing $250,000 could not be justified."); *In re Straight Path*, 2018 WL 3120804, at *13 (controller potentially deprived stockholders of half a billion dollars in the context of a sale valued at $3.1 billion).

According to the Complaint, the challenged compensation awards were worth $82.4 million to the Murdochs.[125] That is a whole lot of money to just about anybody, but it represents just about 1/10th of 1 percent of the $71.3 billion of consideration the Old Fox stockholders received in the Disney Merger. This amount was immaterial to that transaction even by Plaintiff's reckoning[126] and does not support a pleadings stage inference that the sheer value of the Murdochs' stock awards caused Disney to lower the exchange ratio or otherwise alter the terms of the Transaction to the detriment of Old Fox's stockholders.[127]

Tellingly, Plaintiff's initial pleading asserted all of its claims—including a claim for waste—as derivative claims.[128] This is unsurprising given that the gravamen of Plaintiff's allegations is that there was no justification for the Company to award the Murdochs additional compensation to incentivize them to facilitate a transaction with Disney given the substantial stake they already held in Old Fox. In other words, Plaintiff itself recognized it was the Company that suffered harm by

---

[125] Compl. ¶¶ 56, 67.

[126] *See* Mot. to Dismiss Hr'g Tr. 61 (Dkt. 59) (Plaintiff's counsel: "I agree that if, in fact, the law imposes a materiality requirement where the challenged transaction on a numerical basis needs to be material in the context of the size of the deal, that we lose, because as Your Honor mentioned this morning, if you do the math, it's a small amount").

[127] *See Golaine*, 1999 WL 1271882, at *8 ("At the outset, therefore, let me express my doubt that the $20 million fee wagged the $8.3 *billion* merger dog. The $20 million seems quite immaterial in the scheme of things.").

[128] Original Compl. ¶ 94.

paying the Murdochs compensation that Plaintiff contends was unnecessary and wasteful.

Faced with the prospect of losing standing to assert derivative claims post-merger, Plaintiff amended its pleading by dropping its waste claim, a quintessentially derivative claim,[129] and asserting for the first time that its claims were now direct on the theory that the Murdochs "effectively siphoned off value that the Old Fox stockholders otherwise would have realized in the [Transaction]."[130] The amended pleading, however, retained the same underlying factual allegations of the initial pleading and the same central theme, *i.e.*, that it was unnecessary to award the Murdochs additional compensation. And most importantly, no new allegations were added to support the notion that Defendants tainted the sale process or the negotiations so as to improperly divert to the Murdochs part of the consideration for the Transaction. Absent such allegations, Plaintiff's new theory of harm basically boils down to the syllogism then-Vice Chancellor Strine articulated in *Golaine*,

---

[129] *Kramer*, 546 A.2d at 353 ("A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature."); *Parnes*, 722 A.2d at 1245 (discussing *Kramer*'s characterization of waste as a "classic derivative claim").

[130] Compl. ¶ 10.

discussed above, which our Supreme Court rejected in *Kramer* as a basis to maintain a direct claim and which must be rejected here for the same reason.[131]

In sum, having carefully considered Plaintiff's allegations, the court finds nothing in the Complaint to support the notion that Defendants tainted the sale process or the negotiations of the Transaction such that they caused anything to be taken off the table that otherwise would have gone to all of Old Fox's stockholders. Under *Parnes* and its progeny, therefore, Plaintiff's claims are derivative in nature.

## B. Plaintiff Does Not State a Direct Claim Based on Old Fox's Certificate of Incorporation

Plaintiff next asserts that it has alleged a direct claim based on the Defendants' violation of Section 4(c) of Old Fox's certificate of incorporation (the "Equal Treatment Clause").[132] The Equal Treatment clause provides, in relevant part, that:

> In the event of any merger or consolidation . . . the holders of the Class A Common Stock and the holders of the Class B Common Stock shall be entitled to receive substantially identical per share consideration as the per share consideration, if any, received by the holders of such other class . . . .[133]

---

[131] 546 A.2d at 354 ("Having not directly attacked the merger, Kramer's claim of diversion of funds and excessive payments clearly does not rise to an attack on the merger itself sufficient for his suit to survive the merger.").

[132] Compl. ¶¶ 11, 24.

[133] Andrews Aff. Ex. B § 4(c).

Plaintiff contends that "the Murdochs, as holders of Class B Common Stock, received disparate consideration in connection with the [Transaction], which increased their return above that received by the holders of Class A Common Stock."[134] "[T]he Murdochs accomplished their premium," according to Plaintiff "despite nominally being paid the same per share consideration."[135]

"Stockholders are entitled to bring direct claims to enforce their rights under corporate charters."[136] Here, however, Plaintiff has failed to plead facts that support a violation of the Equal Treatment Clause.

For starters, Plaintiff does not allege that the per share consideration the Murdochs received in the Transaction was different than the other stockholders. Both classes of stock received the same consideration and Plaintiff does not explain how the Retention RSUs and the Performance Award Modification can be considered "per share consideration" under the Transaction. This is unsurprising given that both measures were implemented as part of a Company-wide compensation program to retain senior executives. Indeed, the PSU awards for the 2016-2018 performance period, as amended by the Performance Award

---

[134] Pl.'s Opp'n Br. 27-28.

[135] *Id.* 28.

[136] *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049-50 (Del. Ch. 2015) (collecting cases); *Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097, 1107 (Del. Ch. 2014) (same).

Modification, were paid out in August 2018, well before the Transaction closed in March 2019, and were not contingent on the closing of the Transaction.[137]

Plaintiff misplaces reliance on *In re Delphi Financial Group Shareholder Litigation*.[138] Unlike that case, there are no allegations here that the Murdochs attempted to extract a control premium by repealing or amending the Equal Treatment Clause or subverting the clause by agreeing to side deals such as consulting contracts.[139]

In sum, Plaintiff has failed to allege any facts from which it is reasonably conceivable that the challenged compensation awards violated the Equal Treatment Clause to entitle Plaintiff to bring a direct claim.

\* \* \* \* \*

For the reasons explained above, the Complaint fails to state a direct claim under *Parnes* and its progeny or based on a violation of the Equal Treatment Clause. Accordingly, the Complaint only alleges derivative claims. The court turns next to consider whether Plaintiff has standing to pursue its claims "derivatively on behalf of New Fox" as Plaintiff contends.[140]

---

[137] Compl. ¶ 72; Tr. 42, 54.

[138] 2012 WL 729232 (Del. Ch. Mar. 6, 2012).

[139] *Id.* at *17.

[140] Compl. ¶ 95 (asserting, in the alternative to pursuing its claims as direct claims, that Plaintiff may bring its claims derivatively). The parties dispute whether the derivative

## C. Plaintiff Lacks Standing to Bring a Derivative Claim

Section 327 of the Delaware General Corporation Law "provides that a stockholder seeking to assert a derivative action on behalf of a corporation must have been a stockholder at the time of the transaction complained of, or his shares must have devolved upon him by operation of law."[141]  It also "has been well-settled Delaware law for over three decades that stockholders of Delaware corporations must hold shares not only at the time of the alleged wrong, but continuously thereafter throughout the litigation in order to have standing to maintain derivative claims, and will lose standing when their status as stockholders of the company is terminated as a result of a merger, except in one of two specific circumstances."[142] The two exceptions are:

> (i) if the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive stockholders of the standing to bring a derivative action; or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise.[143]

---

claims in the Complaint passed to New Fox or Disney in the Transaction.  *See* Dkt. 58; Dkt. 60. The court need not address this issue because even if the derivative claims did pass to New Fox, Plaintiff has failed to show that it has standing to assert them.

[141] *Ryan v. Gifford*, 918 A.2d 341, 359 (Del. Ch. 2007).

[142] *In re Massey*, 160 A.3d at 497-98.

[143] *Lewis v. Ward*, 852 A.2d 896, 902 (Del. 2004) (clarifying the exceptions originally identified in *Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984)).

The rationale for this rule is that "a derivative claim is a property right owned by the nominal corporate defendant" that then "flows to the acquiring corporation by operation of a merger."[144]

Plaintiff concedes, as it must, that it was not a New Fox stockholder at the time of the challenged stock awards and that it became a New Fox stockholder by way of the Transaction[145] and, therefore, not by operation of law.[146] Plaintiff thus does not satisfy the contemporaneous ownership requirement embedded in Section 327.

Plaintiff asserts that it should be permitted to pursue this action derivatively on behalf of New Fox nevertheless because the Transaction "effected a reorganization of Old Fox (through a spinoff and sale of assets)" and under a theory of "equitable standing."[147] Plaintiff primarily relies on *Helfand v. Gambee*[148] with

---

[144] *Feldman v. Cutaia*, 956 A.2d 655, 654 (Del. Ch. 2008), *aff'd*, 951 A.2d 727 (Del. 2008).

[145] Compl. ¶ 96.

[146] *Gifford*, 918 A.2d at 359 (holding that acquisition of stock by way of merger agreement was "not by operation of law"); *see also Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 937 & n.97 (Del. Ch. 2008) (explaining that "by operation of law" means the stockholder "acquires the shares without any act or cooperation on his or her part" and is frequently applied where the stockholder acquires "shares as a result of rights obtained through a will").

[147] Pl.'s Opp'n Br. 29, 31-32.

[148] 136 A.2d 558, 562 (Del. Ch. 1957).

respect to the first point and *Shaev v. Wyly*[149] as to the latter point, but acknowledges that these cases are "fairly indistinguishable."[150]

*Helfand*, which coincidentally involved a predecessor of Old Fox—Twentieth Century Fox Film Corporation, concerned an application of the "mere reorganization exception."[151] There, the court held that a stockholder of a New York corporation that split into two Delaware corporations in a reorganization was entitled to bring a derivative claim on behalf of one of the Delaware corporations for acts pre-dating its incorporation relating to the predecessor entity. The court rejected defendants' contention that plaintiff lacked standing to maintain the derivative claim just because she held "two pieces of paper rather than one" as evidence of her investment in the predecessor entity.[152]

In *Shaev*, the court allowed a stockholder to sue derivatively on behalf of a subsidiary (Commerce) after its parent (Software) spun off the subsidiary in order to

---

[149] 1998 WL 118200, at *2 (Del. Ch. Mar. 6, 1998).

[150] Tr. 76.

[151] *Lewis v. Ward*, 852 A.2d at 905.

[152] 136 A.2d at 560. *See also Schreiber v. Carney*, 447 A.2d 17, 22 (Del. Ch. 1982) (holding that plaintiff had standing to maintain derivative suit challenging pre-merger acts where the merger was "merely a share for share merger with a newly formed holding company, which retained the old company as a wholly owned subsidiary of the new holding company with the shareholders of the old company owning all the shares of the new holding company" and the "structure of the old and new companies [was] virtually identical").

challenge a self-dealing transaction the directors of the subsidiary approved before the spin-off.[153]  In so holding, the court emphasized that plaintiff "had the right to bring a double derivative action on behalf of Commerce" before the spin-off to challenge the directors' actions and that "to deny standing on these facts would insulate defendants from potential liability for their misdeeds."[154]

The *Shaev* court viewed the situation before it to be "analogous to *Helfand*."[155] Indeed, similar to *Helfand*, the plaintiff in *Shaev* held "two pieces of paper rather than one" after the spin-off but the underlying business enterprise of the former subsidiary remained the same after the spin-off.  Put differently, *Helfand* and *Shaev* appear, in substance, to both fall within the "mere reorganization" exception.

In *Lewis v. Anderson*, our Supreme Court explained that the reorganization exception to the continuous ownership rule of standing applied "where the merger is in reality a reorganization which does not affect the plaintiff's ownership of the business enterprise."[156]  Later that year, after noting that the exception applies where the "surviving entity is merely the same corporate structure under a new name," this court held that the exception did not apply to a transaction that was "the result of a

---

[153] 1998 WL 13858, at *1 (Del. Ch. Jan. 6, 1998), *reargument denied*, 1998 WL 118200 (Del. Ch. Mar. 6, 1998), *aff'd*, 719 A.2d 490 (Del. 1998).

[154] *Id.* at *4-5.

[155] *Id.* at *4.

[156] 477 A.2 at 1046 n.10.

merger of two distinct corporations each of which had separate boards, officers, assets and stockholders."[157]   Twenty years later, the Supreme Court added the qualifier "merely" to its articulation of the exception, *i.e.*, "if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise."[158]

In my view, the facts here do not come close to satisfying the "mere reorganization exception."   To start, the Complaint does not allege that the New Fox spinoff was a mere reorganization.  Nor could it.  After the Transaction closed, New Fox was vastly different than Old Fox:  only a portion of Old Fox's assets were transferred to New Fox (*i.e.*, its news, sports and broadcast businesses); New Fox only assumed certain liabilities related to those assets; and Disney retained everything else, for which it paid $71.3 billion to combine with its own operations.[159] Post-closing, moreover, the composition of the New Fox board was different than

---

[157] *Bonime v. Biaggini*, 1984 WL 19830, at *2-3 (Del. Ch. 1984), *aff'd*, 505 A.2d 451 (Del. 1985); *see also Ward*, 852 A.2d at 904 (finding that the "mere reorganization exception" did not apply because merger of two distinct corporations "was far more than a corporate reshuffling."); *Schreiber*, 447 A.2d at 22 (noting that "[s]everal Delaware cases have denied standing to maintain a stockholder's derivative suit after a merger" where "the mergers were either cash-out mergers or mergers with outside or pre-existing corporations with substantial assets") (citations omitted).

[158] *Ward*, 852 A.2d at 902 (discussing its articulation of the exception in *Kramer*, 546 A.2d at 354).

[159] Compl. ¶¶ 14, 35, 37; Proxy, at 208-12.

the Old Fox board.[160]  In short, the Transaction plainly did not amount to "merely the same corporate structure under a new name."[161]  Accordingly, Plaintiff does not fall within an exception to the continuous ownership rule and thus does not have standing to pursue its derivative claims on behalf of New Fox.[162]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint with prejudice is GRANTED.

**IT IS SO ORDERED.**

---

[160] Compl. ¶¶ 98, 114.

[161] *Bonime*, 1984 WL 19830, at *3.

[162] Given this conclusion, the court does not reach the issue of demand futility or any of the other grounds for dismissal advanced by Defendants.